408 S.E.2d 365

**In the Interest of CARLITA B.**

**No. 19899.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 5, 1991.

Decided July 29, 1991.

Concurring Opinion of Chief Justice Miller July 31, 1991.

Barbara L. Baxter, West Virginia Legal Services, Wheeling, for appellant.

Mario J. Palumbo, Atty. Gen., Jeffrey K. Matherly, Asst. Atty. Gen., for State of W.Va.

WORKMAN, Justice:

Justina N.[1] appeals from an order of the Circuit Court of Ohio County which terminated her parental rights to her daughter, Carlita B. The circuit court found that the appellant was guilty of abuse and neglect of Carlita and that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the near future. The appellant contends that the circuit court erred in terminating her parental rights because 1) neither the Department of Human Services (hereinafter "D.H.S.")[2] nor the specific D.H.S. caseworker assigned to the case made a reasonable effort to reunify the family as required by W.Va. Code § 49–6–5 (1988); 2) the assigned D.H.S. caseworker failed to develop a real-

---

1. We adhere to our traditional practice in domestic relations and other sensitive cases and do not use the last names of the parties. *See* e.g., *Nancy Viola R. v. Randolph W.,* 178 W.Va. 710, 356 S.E.2d 464, 465 n. 1 (1987), *West Virginia Dept. of Human Serv. v. La Rea Ann C.L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985).

2. The Department of Human Services is now known as the Division of Human Services, and is now a part of the Department of Health and Human Resources. *See* W.Va.Code § 5F–2–1(d)(2) (1990); W.Va.Code § 5F–2–1(j) (1990); W.Va.Code § 9–2–1a (1985).

istic case plan for the appellant as required by W.Va.Code § 49–6D–3 (1984); 3) the circuit court erred in finding that the appellant suffered from erratic behavior and outbursts of anger to the extent that such behavior made her incapable of exercising proper parenting skills; and 4) the circuit court erred in finding that the appellant abused her children other than Carlita because such evidence was (a) not relevant to this proceeding and should have been excluded, and (b) in the alternative, was not established by clear and convincing evidence. We disagree with the contentions of the appellant and affirm the order of the Circuit Court of Ohio County.

## I. FACTS

The appellant is the mother of four children. Her parental rights to her oldest child, Justin, were terminated when the child was approximately three years of age, based upon the appellant's abusive actions toward the child. She apparently beat him on the legs and back, pulled out large areas of his hair, and threatened, in the presence of a D.H.S. caseworker, to drown both the oldest child and her second child, Christopher.[3]

At the initiation of this action regarding Carlita, born on October 22, 1985, the appellant was living with Robert B., Carlita's father. On March 27, 1987, Dixie Laudermilt, a caseworker for the D.H.S., filed a petition to have Carlita removed from the home. The petition was based upon the following: (1) an alleged March 25, 1986, incident in which Robert B. reported that the appellant had thrown five-month-old Carlita onto a bed in a violent manner; (2)

a November 14, 1986, incident in which the Wheeling Police were called to the appellant's residence to investigate a domestic dispute and discovered a red hand print on Carlita's back[4] (Robert B. and the appellant both admitted that the appellant had slapped the child, then thirteen months old, subsequent to an argument between Robert B. and the appellant); (3) allegations that the appellant had taken the child to bars in the late night and early morning hours; (4) allegations that the appellant would occasionally fail to feed Carlita until Robert B. returned from work in the evening due to the appellant's lack of patience in feeding the young child (Once Robert B. returned from work, he would allegedly feed the child for the first time of the day); (5) allegations by neighbors that they had heard the appellant screaming at the child and had heard the child fall out of its crib.

The appellant contends that Ms. Laudermilt's decision to petition for termination of the appellant's parental rights to Carlita was also premised upon the deteriorating relationship between the appellant and Ms. Laudermilt. Ms. Laudermilt had become acquainted with the appellant's family while Justin and Christopher were both residing in the household. Ms. Laudermilt had been instrumental in removing Justin from the home and had been given the responsibility of attempting to reintegrate Christopher into the home. While Ms. Laudermilt had visited the appellant's home with Christopher, complete reintegration had not been accomplished. During a visit in January 1987, the appellant became angry with Ms. Laudermilt when Ms. Laudermilt indicated that the visitation period had

---

**3.** While only Carlita is the subject of this action, it is worthwhile to note that both Justin and Christopher were removed from the home in 1984 based upon the appellant's abuse of Justin. In 1987, the Circuit Court of Ohio County ordered that Christopher be reintegrated into the home. By January 1990, only daytime visitation had been accomplished between the appellant and Christopher, and no overnight visitation had been scheduled. The D.H.S. contends that this lack of complete integration is due to the appellant's refusal to cooperate with the D.H.S.

The appellant's fourth child, Daniel, was born with severe medical problems and was placed in

a foster home to facilitate thorough medical care. Although it is not entirely clear from the record before us, it appears that Daniel was removed from the custody of his parents with their consent due to the necessity for constant medical attention. Neither Justin, Christopher, nor Daniel is involved in the present termination action.

**4.** According to the testimony of Raymond La-Rue, the Wheeling Police had been summoned to the appellant's residence to investigate domestic disputes on three occasions during November 1986.

expired. As Ms. Laudermilt attempted to remove Christopher from the appellant's arms, the appellant kicked Ms. Laudermilt in the stomach. Ms. Laudermilt filed assault charges, and the appellant was jailed for two to three hours. When the appellant explained that she was pregnant, she was released from jail, and Ms. Laudermilt signed a mental hygiene petition to have her involuntarily committed to a behavioral health center.

A hearing on the petition for termination of the appellant's parental rights to Carlita was held on April 23, 1987. Testimony was elicited from Ms. Laudermilt; Bea Lahita, a homemaker services worker who had as-

sisted the appellant with such household tasks as planning meals and preparing budgets; Gloria Johnston, a D.H.S. worker who had previously worked with the appellant; and Wheeling Police Officer Raymond LaRue, the officer who saw the red hand print on Carlita's back. At the conclusion of the presentation of evidence, the appellant was granted a six-month improvement period pursuant to W.Va.Code § 49–6–2(b) (1984).[5] Physical and legal custody of Carlita was given to the D.H.S. with supervised visitation permitted. The D.H.S. prepared and submitted a family case plan as required by W.Va.Code § 49–6D–3.[6] Two plans, dated November 20,

**5.** West Virginia Code § 49–6–2(b) provides as follows:

> In any proceeding under this article, the parents or custodians may, prior to final hearing, move to be allowed *an improvement period of three to twelve months* in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof, but may *require temporary custody in the state department* or other agency during the improvement period. An order granting such improvement period shall require the department to prepare and submit to the court a family case plan in accordance with the provisions of section three [§ 49–6D–3], article six-D of this chapter. (emphasis added)

West Virginia Code § 49–6–5(c) (1988) also provides for a postdispositional improvement period as follows:

> The court may as an alternative disposition allow to the parents or custodians an improvement period not to exceed twelve months. During this period the parental rights shall not be permanently terminated and the court shall require the parent to rectify the conditions upon which the determination was based. No more than one such postdispositional improvement period may be granted. The court may order the child to be placed with the parents, a relative, the state department or other appropriate placement during the period. At the end of the period the court shall hold a hearing to determine whether the conditions have been adequately improved, and at the conclusion of such hearing, shall make a further dispositional order in accordance with this section.

No specific guidelines or goals were included within the improvement period order entered in the present case. While the lack of specific goals in the improvement order certainly does not invalidate such order, a better practice

would entail the inclusion of distinct goals formulated by the court within the improvement period order. The family case plan and improvement period order could then be interrelated to provide a detailed guide to the achievement of the court-specified goals.

**6.** West Virginia Code § 49–6D–3(a) (1986), in pertinent part, provides as follows:

> (a) Within the limits of funds available, the department of human services shall develop a *family case plan for every family wherein a person has been referred to the department* after being allowed an improvement period under the provisions of subsection (b), section two, or subsection (c), section five [§ 49–6–2(b) or § 49–6–5(c)], article six of this chapter, *and for each family referred to the department for supervision and treatment following a determination by a court that a parent, guardian, or custodian in such family has abused or neglected a child.* . . . The family case plan is to clearly set forth an organized, *realistic method of identifying family problems and the logical steps to be used in resolving or lessening those problems.* Every family case plan prepared by the department shall contain the following:
> (1) A listing of specific, measurable, realistic goals to be achieved;
> (2) An arrangement of goals into an order of priority;
> (3) A listing of the problems that will be addressed by each goal;
> (4) A specific description of how the assigned caseworker or caseworkers and the abusing parent, guardian or custodian will achieve each goal;
> (5) A description of the departmental and community resources to be used in implementing the proposed actions and services;
> (6) A list of the services which will be provided;
> (7) Time targets for the achievement of goals or portions of goals;

1987, and August 25, 1988, were formulated.[7]

## II. RESULTS OF FIRST IMPROVEMENT PERIOD

A hearing on the success of the improvement period was held on November 10, 1987. Ms. Laudermilt testified for the D.H.S. and explained that she had been involved with Carlita and her family during the improvement period which was originally granted on April 28, 1987. Ms. Laudermilt explained that there had been daytime visitation between the child and her parents two to three times per month. Ms. Laudermilt stated that the D.H.S. had experienced no difficulty during the home visitation and explained that the appellant and Robert B. had taken Carlita to the playground and had hosted a birthday party for her. With regard to gradual reintegration back into parental custody, Ms. Laudermilt stated that the prior visits had been of two to three hours duration and suggested that subsequent visitation be increased to six to eight hours with D.H.S. workers present 50 to 60 percent of the time. Ms. Laudermilt testified that Carlita "takes a while to make up to [the appellant and Robert B.] and it will be an hour before she will even go to them and play, especially with Robert."

Ms. Laudermilt also discussed physical confrontations and arguments between the appellant and Robert B., with the appellant being physically aggressive toward Robert B. Ms. Laudermilt explained that she and Bea Lahita had both received telephone calls from the morning to late hours of the night during the previous six months in which Robert B. had complained that the appellant was fighting with him or locking him out of the house. Ms. Lahita expressed her opinion that the relationship between the parties had not significantly improved and that it would not be in the best interest of the child to return to the home at that time. At the conclusion of the hearing, the lower court stated that due to the lack of updated psychological reports and evaluations as a basis to determine whether Carlita would be safe in the home environment, the improvement period would be extended for an additional six months.

An evaluation of the appellant and Robert B. was conducted by social worker Laurie Taylor, and a report dated December 3, 1987, was submitted. Ms. Taylor found that the appellant and Robert B. lacked a clear understanding of the legal ramifications of Carlita's placement and that the appellant and Robert B. associated her placement with the ongoing personality problems between the appellant and Ms. Laudermilt. Ms. Taylor found the appellant and Robert B. to be angry, bitter, and disillusioned about the custody situation. The thrust of Ms. Taylor's report was that the parties' home was adequate for raising children and that they possessed all neces-

---

(8) An assignment of tasks to the abusing or neglecting parent, guardian or custodian, to the caseworker or caseworkers, and to other participants in the planning process; and
(9) A designation of when and how often tasks will be performed.

7. The November 20, 1987, plan provided the following criteria for goal assessment:
   1) Justina and Robert should go to Northern Panhandle Behavioral Health Center 2–3 times per month to learn positive parenting skills 90% of scheduled visits with therapist.
   2) Justina and Robert be ready for home visits and have positive interactions with Carlita 95% of the time.
   3) Justina and Robert prepare appropriate meals for Carlita.
   4) Justina and Robert follow suggestions of West Virginia Department of Human Services'

workers for parenting skills and proper meals 90% of the time.
The August 25, 1988, plan provided the following criteria for goal assessment:
   1. Justina needs to attend 95% of her Anger Control Group meetings and only miss if medically proven by a doctor's note.
   2. Justina and Robert go to therapy sessions with Mary Lou Petrisko 95% of the time.
   3. Justina & Robert will follow through with homemaking and parenting suggestions given by WV Depart. of Human Ser. workers and go to scheduled Outreach meetings 95% of the time.
   4. Justina & Robert will be up waiting for Christopher, prepare meals & follow suggestions of WV Depart. of Human Services staff 95% of the time.
   5. Court will reunite family or terminate parental rights after 6 months on intervention.

sary furniture. Home visitation by Ms. Taylor was varied as to time and notice, and no problems were encountered with the couple or with neighbors. Ms. Taylor noted the conflict and adversarial relationship between the appellant and Ms. Laudermilt, recognized that such a relationship made appropriate work with the family difficult, and suggested a change of D.H.S. caseworkers.

Dr. Charles Hewitt, psychologist, also evaluated the appellant and Robert B. and submitted several reports to the D.H.S. Dr. Hewitt had been involved with the family through termination proceedings held on behalf of Justin and had previously evaluated the parties. He reported that the appellant was functioning in the borderline range with some indication of low average cognitive functioning, but stressed that she was not mentally retarded. Dr. Hewitt noted serious personality difficulties suffered by the appellant with noticeable abusiveness and insensitivity. He also stated that the appellant loves her children but has personality problems which interfere with her ability to manage their difficult behavior. He recognized the adversarial relationship between the appellant and Ms. Laudermilt and stated that such conflict may interfere with D.H.S. attempts to assist the family. Dr. Hewitt recommended the continuing use of homemaker services and suggested that an effort be made to reintegrate Christopher and Carlita into the household.

Dr. Dennis J. Maceiko, psychologist, also evaluated the appellant and submitted reports dated April 1986 and October 1988.[8] In his first report, Dr. Maceiko found that the appellant had a very low frustration level and was easily agitated. He felt uncomfortable allowing the appellant to have custody of Justin or Christopher and also felt that, due to the appellant's intense

explosions, Carlita's safety was in jeopardy while she remained in the home. Dr. Maceiko's second report, dated October 5, 1988, was based upon a July 16, 1987, visit with the appellant and Robert B. Dr. Maceiko noted anger and poor impulse control in the appellant. He stated that she quickly varied from cooperative to quite irritable during the interview, that she had difficulty dealing with stress, and that her frustration tolerance level was very low.

## III.  RESULTS OF SECOND IMPROVEMENT PERIOD

A hearing marking the conclusion of the second improvement period was scheduled for June 17, 1988. Due to the nonappearance of the appellant, the hearing was continued to July 26, 1988.[9] At the July 26, 1988 hearing, Ms. Laudermilt again testified regarding the appellant's lack of cooperation and apparent inability to control her emotional outbursts. Specifically, Ms. Laudermilt testified that the appellant had been provided with counselling during home visitation regarding necessary care for Carlita. Ms. Laudermilt stated that the home visits continued until approximately December 1987, "when things became more anxious ..." for the appellant. Ms. Laudermilt described "more screaming and hollering during home visits. [The appellant] was with Bobby [Robert B.] in the evenings and would fight and physically assault him." Ms. Laudermilt also explained that the appellant declined to participate in parenting classes offered through Dr. Hewitt, Dr. Maceiko, or Northern Panhandle Behavioral Health Center. Ms. Laudermilt testified that in approximately March 1988, she accompanied the appellant to a mothers' group organized for children and family services, but that the appellant left during the session and refused to return for future sessions.

8.  It appears that Dr. Maceiko submitted his psychological reports on behalf of the D.H.S. and that Dr. Hewett submitted his report on behalf of the appellant and Robert B.

9.  The appellant was apparently present prior to the beginning of the proceedings on June 17,

1988, but left before the proceedings actually began. Based upon her absence, the hearing was continued to July 26, 1988. Even at that July 26, 1988, hearing, the appellant did not appear, and the court proceeded in her absence.

Ms. Laudermilt described typical home visits as consisting of very little physical or verbal contact between the child and the parents. Most contact which was accomplished had been initiated by the D.H.S. workers rather than the parents. With regard to cooperation with suggestions of the D.H.S., Ms. Laudermilt testified that she had "seen a decline in improvement on [the appellant's] part for the fact that there is no cooperation there." Ms. Laudermilt provided examples of several attempts at visitation where the parents had overslept or had been up late watching television the night before and failed to appear for the scheduled visits. Ms. Laudermilt explained that the parents had sufficient prior notice of scheduled visits and still failed to appear. Ms. Laudermilt testified that the appellant had only visited with her children twice from January 1988 through July 1988. With regard to visitation, Ms. Laudermilt explained:

Whenever we go at 9:00 o'clock [sic] 9:30, they would not be out of bed. When it was in the afternoon, say like 1:00 o'clock [sic], they would be there, and that usually was the times where Tina would become irrational and start screaming and hollering at Bobby or the kids or myself or the other worker or all of us, and the children would be taken from the home at that point, and Bobby would supervise or walk with us to the car to take the kids to the car.

When asked what precipitated the appellant's outbursts, Ms. Laudermilt explained that it could be small or inconsequential things (e.g. "it could be the fact that Carlita would not eat the rest of her cereal, that she would start becoming angry, and as things continued to go on, she would become more angry.")

Due to lack of time to present remaining witnesses during the July 26, 1988, hearing, the matter was continued to August 1, 1988. During the August 1, 1988, hearing, Bea Lahita testified that she began working with the appellant and Robert B. in

January 1985 as a homemaker attempting to teach them cooking and budgeting skills. Ms. Lahita reported that she had experienced problems with the appellant or Robert B. calling her late at night once or twice a week with complaints of fighting with one another. Ms. Lahita also testified that she had attempted to schedule counselling for the appellant and Robert B., but that they had refused to participate. Ms. Lahita further stated that the appellant had refused to take medication which had been prescribed to control her anger.[10]

Jamie Wharton, an outreach worker at the Florence Crittenton Home, also testified at the August 1, 1988, hearing regarding her involvement with the parties. The D.H.S. referred the parties to the Florence Crittenton Home for assistance in parenting skills, teaching basic skills such as interaction, diapering, feeding, and temperature taking. Ms. Wharton testified that the workers attempted home visits two to three times per month for such instruction. Although the parties cooperated with the workers immediately after Daniel's birth to receive assistance with his medical problems prior to his removal from the home, cooperation decreased significantly thereafter. From January 1985 through August 1988, the workers continued to attempt visitation with the parties in order to provide homemaker services, but frequently found no one at home.

At the conclusion of the August 1, 1988, hearing, the lower court indicated that it would render a decision after reading the files and the psychological evaluations. The court also ordered counsel for each party to submit a written argument stating their respective positions as to disposition of the matter. The court further stated that the matter would be taken under advisement pending the filing of written arguments.

On January 30, 1989, the lower court entered an order terminating the appellant's parental rights to Carlita. The court found that the appellant was guilty of

---

**10.** The appellant had been prescribed an anger control medication by a Dr. Mendoza at Northern Panhandle Behavioral Health Center, but the appellant refused to take the medication on a consistent basis.

abuse and neglect of Carlita and that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future.[11] The court held that the appellant had failed to comply with the family case plan, had failed to appropriately participate in visitation, suffered from erratic behavior and outbursts of anger, and had a history of causing physical abuse to her infant children. Due to a delay in producing transcripts, the appeal period was extended for an additional four months by order dated September 25, 1989, and the final order from which the appellant now appeals was re-entered on January 24, 1990. The petition for appeal was filed on October 3, 1990, over eight months after the re-entry of the termination order. This Court accepted the appeal on December 5, 1990, and expedited oral argument to February 5, 1991.

## IV. PROCEDURAL DELAY

Before addressing the merits of this case, we examine the long and tortured procedural history this matter has endured. The petition to terminate parental rights in this case was filed on March 27, 1987. The first hearing on the matter was held on April 23, 1987, wherein an improvement period was granted; another hearing was held on November 10, 1987, wherein the improvement period was extended six months and psychological reports were ordered updated; additional hearings were held on July 26, 1988, and August 1, 1988, and parental rights were finally terminated on January 30, 1989. Due to problems in acquiring a transcript, the final appealable order was re-entered almost a year later on January 24, 1990. Thus, even prior to the appeal to this Court, Carlita remained in limbo for almost three years during the most formative stages of her young life.

Although Carlita's brother Christopher's case is not presently before the Court, its procedural progression is even more egregious. He was removed from the home as an infant in 1984 based upon the appellant's abuse of his brother Justin. It took until November 20, 1987, for the lower court to determine that he should be reintegrated into the home. The last visit between Christopher and his parents occurred in March 1989, and no requests for visitation were received after that time. Christopher has resided with his present foster family from March 1987 to the present. A hearing on Christopher's disposition has been scheduled for August 16, 1991. This child has now been in foster care for almost seven years with no real resolution of his future.

Such protracted procedural histories are far too common a phenomenon in child abuse and neglect cases, as well as other child custody matters. Several cases with which we have dealt have involved similar extended periods of time without any real resolution for the child.

In our recent opinion in *In the Matter of Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991), the original allegation of abuse and neglect was filed on February 11, 1985. Following proceedings in the matter, an order was entered on March 17, 1989, concluding that the appellee had not abused his children. Thus, the final order, from which appeal was taken, was not entered until over four years after the neglect proceeding was initiated.

In *Department of Human Services v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985), a child born in 1980 was voluntarily relinquished by her mother shortly after birth and resided in foster care for four years pending final resolution of a subsequent attempt to revoke the relinquishment of parental rights. We recognized in *La Rea Ann*, that "[c]hild custody cases certainly should be decided promptly. Regardless of who is responsible for the delay in this case, the child is the unfortunate victim." *Id.* 175 W.Va. at 337 n. 8, 332 S.E.2d at 638 n. 8.

In *State v. Scritchfield*, 167 W.Va. 683, 280 S.E.2d 315 (1981), the Department of Welfare had petitioned to remove three

---

11. This finding by the lower court is specifically required by W.Va.Code § 49-6-5(a)(6) as a pre- requisite to termination of parental rights.

children from the custody of their mother in June 1976. The two older children were returned in 1977, but the youngest child remained in foster care in the temporary custody of the Department of Welfare. 167 W.Va. at 686, 280 S.E.2d at 318. On September 1, 1978, the Department of Welfare sought to have the youngest child declared a neglected child, citing the medical condition of the mother and the fact that the child had been in foster care since 1976. *Id.* 167 W.Va. at 684, 280 S.E.2d at 317. On June 6, 1979, the court finally entered an order finding the child to be neglected and terminating the parental rights of the parents. *Id.* 167 W.Va. at 687–688, 280 S.E.2d at 319. Again, we find an approximate three-year period in which the child's disposition remained unresolved.

Certainly many delays are occasioned by the fact that troubled human relationships and aggravated parenting problems are not remedied overnight. The law properly recognizes that rights of natural parents enjoy a great deal of protection and that one of the primary goals of the social services network and the courts is to give aid to parents and children in an effort to reunite them.

The bulk of the most aggravated procedural delays, however, are occasioned less by the complexities of mending broken people and relationships than by the tendency of these types of cases to fall through the cracks in the system. The long procedural delays in this and most other abuse and neglect cases considered by this Court in the last decade indicate that neither the lawyers nor the courts are doing an adequate job of assuring that children—the most voiceless segment of our society—aren't left to languish in a limbo-like state during a time most crucial to their human development.

As explained in J. Goldstein, A. Freud & J. Solnit, *Beyond the Best Interests of the Child* 32–33 (1973),

Continuity of relationships, surroundings and environmental influence are es-

sential for a child's normal development. Since they do not play the same role in later life, their importance is often underrated by the adult world.

Physical, emotional, intellectual, social, and moral growth does not happen without causing the child inevitable internal difficulties. The instability of all mental processes during the period of development needs to be offset by stability and uninterrupted support from external sources. Smooth growth is arrested or disrupted when upheavals and changes in the external world are added to the internal ones.[12]

This is especially true during the first three years of life. Burton L. White, Ph.D., in his book, *The First Three Years of Life* (1985), begins his preface as follows:

After seventeen years of research on how human beings acquire their abilities, I have become convinced that it is to the first three years of life that we should now turn most of our attention. My own studies, as well as the work of many others, have clearly indicated that the experiences of those first years are far more important than we had previously thought. In their simple everyday activities, infants and toddlers form the foundations of *all* later development.

*Id.* at v.

In the first chapter of her book, *The Critical Years: A Guide for Dedicated Parents* (1984), Doris E. Durrell, Ph.D., explains the following:

Throughout my years of experience in raising children and treating children in a clinical setting, I have been continually impressed with the degree to which personality has been formed by the time a child is three years old. By this time, certain positive behaviors will have been established which will continue to bring your child positive responses, or negative behaviors may be established which will cause your child problems with peers and adults.

*Id.* at 9.

■ Child abuse and neglect cases must be recognized as being among the highest

---

**12.** The Goldstein, et al. presentation has previously been cited by this Court in other cases involving child matters. *See David M. v. Marga-*

*ret M.,* 182 W.Va. 57, 62, 385 S.E.2d 912, 917 n. 10 (1989); *J.E.I. v. L.M.I.,* 173 W.Va. 194, 199–200 n. 2, 314 S.E.2d 67, 73 n. 2 (1984).

priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security. Consequently, in order to assure that all entities are actively pursuing the goals of the child abuse and neglect statutes, the Administrative Director of this Court is hereby directed to work with the clerks of the circuit court to develop systems to monitor the status and progress of child neglect and abuse cases in the courts. Whether a simple tickler file system or an enhancement to a computerized case monitoring system, some means of systematic review of child neglect and abuse cases must be established. Otherwise, the statutory time frames that govern their processing and the mandatory, periodic status reports that must be filed with the court are too easily overlooked. If such safeguards are rendered meaningless by a failure or inability to monitor cases, neglected and abused children may become lost in the very system designed to rescue them.

## V. THE PROCESS OF TERMINATION

■ The standard for determining the fitness of a parent to maintain custody of his child was recently reiterated in syllabus point 1 of *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987) (quoting Syl. Pt. 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975)). We stated the following:

'A parent has the natural right to the custody of his or her infant child, and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts. Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d [798] (1969).'

West Virginia Code § 49–6–5(a)(6) (1988) governs the procedure for termination of parental rights and unequivocally states that a parent's rights may be terminated "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child...."

■ The appellant contends that the D.H.S. failed to make a reasonable effort to reunify her family, pursuant to W.Va. Code § 49–6–5, and failed to develop a realistic family case plan as required by W.Va. Code § 49–6D–3.[13] The appellant requested and was granted a six-month improvement period, in accordance with W.Va.Code § 49–6–2(b). She was later granted a second six-month improvement period. As we stated in syllabus point 3 of *State ex rel. West Virginia Dept. of Human Serv. v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987), "[u]nder W.Va.Code, 49–6–2(b) (1984), when an improvement period is authorized, then the court by order shall require the Department of Human Services to prepare a family case plan pursuant to W.Va.Code, 49–6D–3 (1984)." Such plans were prepared for the appellant and filed with the circuit court in this case. The purpose of the family case plan "is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." *Cheryl M.*, 177 W.Va. at 693, 356 S.E.2d at 186 (quoting W.Va.Code § 49–6D–3(a)).

The D.H.S. certainly could have acted with greater dispatch in preparing the first family case plan, for it was not completed until some seven months after the beginning of the first improvement period. However, the appellant wasn't harmed as a result of this delay both because D.H.S. did take immediate steps to offer services and because the improvement period was extended an additional six months. Such delays do, however, always harm the child, as the significance of a six-month period in the first three years of life must once again be viewed as an extremely vital time in the course of a child's human development.

---

**13.** Although the appellant presents these interrelated issues as two separate assignments of error, we have combined them for purposes of discussion on appeal.

■ In formulating the improvement period and family case plans, courts and social service workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents. The formulation of the improvement period and family case plans should therefore be a consolidated, multidisciplinary effort among the court system, the parents, attorneys,[14] social service agencies, and any other helping personnel involved in assisting the family. The goal should be the development of a program designed to assist the parent(s) in dealing with any problems which interfere with his ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result. The improvement period and family case plans must establish specific measures for the achievement of these goals, as an improvement period must be more than a mere passage of time. It is a period in which the D.H.S. and the court should attempt to facilitate the parent's success, but wherein the parent must understand that he bears a responsibility to demonstrate sufficient progress and improvement to justify return to him of the child.

■ Subsequent to the initial formulation of the improvement plan and family case plans, it is imperative that the progress of the parent(s) toward the achievement of enumerated goals be monitored closely. As provided in W.Va.Code

§ 49–6–2(d), proceedings filed under the child abuse or neglect provisions

shall, to the extent practicable, be given priority over any other civil action before the court, except proceedings under article two-A [§ 48–2A–1 et seq.], chapter forty-eight of this Code [prevention of domestic violence] and actions in which trial is in progress. Any petition filed under the provisions of this article shall be docketed immediately upon filing. Any hearing to be held at the end of any improvement period and any other hearing to be held during any proceedings under the provisions of this article shall be held as nearly as practicable on successive days and, with respect to said hearing to be held at the end of an improvement period, shall be held as close in time as possible after the end of said improvement period.

The clear import of the statute is that matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible.

■ During the improvement period, the status of the child(ren) and the progress of the parent(s) in satisfying the conditions of the improvement period should be monitored by the circuit court on a monthly basis. To the extent possible, such review should also incorporate the multi-disciplinary approach, with social workers and other helping personnel present in the court with attorneys and parties to review progress and assure the program is being followed and improvement being made.[15]

**14.** With regard to the appointment of attorneys to represent children in such actions, it is a better practice for courts to attempt to appoint attorneys who have demonstrated interest in such sensitive matters and who will be committed to achieving a result which will serve the best interest of the child. Furthermore, effectively representing children in abuse and neglect cases frequently requires far more than just legal ability. As courts have increasingly been thrust into the arena of social issues, it has become clear that lawyers and judges must deal with the human dimension of such problems. This requires the willingness and ability to communicate with parents, social workers, physi-

cians, psychiatrists, psychologists and counselors, teachers, and—most importantly—children.

**15.** At the outset of an improvement period, the attorneys for the parents should apprise the court if their clients foresee any obstacles to compliance with the plan of improvement, and the court should make any directives necessary to obliterate such obstacles. For instance, if the parent indicates he is unable to attend a specified program due to lack of transportation or conflict with hours of employment, the circuit court can direct the D.H.S. to assist with transportation or arrange a program which does not conflict with the parent's work schedule. The

At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

■ As we explained in *West Virginia Dept. of Human Serv. v. Peggy F.*, 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990), it is possible for an individual to show "compliance with specific aspects of the case plan" while failing "to improve ... [the] overall attitude and approach to parenting." Thus, a judgment regarding the success of an improvement period is within the court's discretion regardless of whether or not the individual has completed all suggestions or goals set forth in family case plans.

> The improvement period is granted to allow the parent an opportunity to remedy the existing problems. The case plan simply provides an approach to solving them. As is clear from the language of the statute, ... the ultimate goal is restoration of a stable family environment, not simply meeting the requirements of the case plan.

184 W.Va. at 64, 399 S.E.2d at 464.

■ In the present case, two family case plans, dated November 20, 1987, and August 25, 1988, were formulated to assist the appellant. The appellant contends that the plans were unrealistic and that the success of the plans was dependent upon Ms. Laudermilt, with whom the appellant maintained an adverse relationship. The appellant bases her contention that the plans were unrealistic on the fact that the two psychologists involved in this matter, Dr. Hewitt and Dr. Maceiko, made recommendations for treatment of the appellant which were not specifically included in the case plan. Dr. Maceiko, for instance, recommended in his April 10, 1986, report that the appellant receive psychotherapy and chemotherapy for control of her violent impulses.[16] He also stated that the appellant would not be a good candidate for parenting groups "simply because of the many problems that she has to contend with—intellectual, poor impulse control, stress management problem, etc."

Dr. Hewitt, however, explained in his April 30, 1988, report that "psychotherapy or counselling per se is not likely to be useful to [the appellant]." Dr. Hewitt further noted that the conflict between the appellant and Ms. Laudermilt seriously interfered with the development of a meaningful plan to attempt to reintegrate the children back into the household. Dr. Hewitt further recommended in his April 30, 1988, report that meaningful attempts be made to reintegrate Christopher and Carlita into the household and to permit homemaker services to continue.

The appellant argues that the D.H.S., in formulating the family case plans, ignored the suggestions of the psychologists. Despite Dr. Maceiko's opinion that the appellant was not a good candidate for parenting groups, for instance, the case plan required the appellant to attend anger control group meetings, parental group classes, play therapy, and parenting assistance classes.

Upon review of the plans and the reports of the psychologists, we fail to discern any unfairness in the family case plans. They were realistic and appropriate in their attempts to address the particular needs of the family. Reports rendered by psychologists are certainly of assistance to a court in determining the psychological capacity of an individual to raise a child and of assistance to the D.H.S. in formulating the

court bears an obligation, at the initiation of an improvement period, to facilitate communication amongst the parties so that there is no mistake as to what is expected of the parents and the department. In addition, the court should ascertain that someone is communicating with the children to assure they have some grasp of why their lives have turned so topsy-turvy, and to assure they are receiving counselling, tutoring, or any other services needed to provide them with as much stability and continuity as possible under the circumstances.

**16.** As mentioned earlier, appellant has indeed been prescribed an anger control medication, but refused to take it on a consistent basis.

tactics to be employed in the attempt to remedy the familial problems. The family case plans, however, are not required to reflect the recommendations of a particular psychologist in every detail. On the issue of psychotherapy, for instance, the reports of Dr. Maceiko and Dr. Hewitt differed with regard to the potential efficacy of such treatment for the appellant. Thus, formulation of a family case plan in perfect congruity with both reports would have been difficult.

Furthermore, we find the appellant's argument that the success of the family case plans was dependent upon Ms. Laudermilt to be meritless. Ms. Laudermilt was not the only individual providing assistance to the appellant. Beatrice Lahita, a D.H.S. worker providing home services, was also involved in the framework of assistance to the appellant. Therapists at Northern Panhandle Behavioral Health Center and workers from the Florence Crittenton Home were also involved in attempting to provide parenting education and skills. All of these social work personnel found the appellant extremely difficult and not very receptive to accepting assistance.

In executing the improvement plan and the family case plans, the D.H.S. is also obligated to make reasonable efforts to reunify the family, and the "court shall consider the efforts made by the department to provide remedial and reunification services to the parent." W.Va.Code § 49–6–5(a)(6). Furthermore, the court's order is to specifically state "whether or not the state department made a reasonable effort to prevent the placement or that the emergency situation made such efforts unreasonable or impossible" and "whether or not the state department made a reasonable effort to reunify the family including a description of what efforts were made or that such efforts were unreasonable due to specific circumstances." *Id.*

The thrust of the appellant's argument with regard to lack of reasonable effort is that the uncooperative relationship between the appellant and Ms. Laudermilt rendered it impossible for the appellant to fully comply with the improvement period and family case plans. The appellant contends that the D.H.S. should have removed Ms. Laudermilt from the appellant's case as it became apparent that an adversarial relationship was developing between Ms. Laudermilt and the appellant. The appellant further argues that the D.H.S.'s failure to attempt to remedy the hostility and mistrust which existed between the appellant and Ms. Laudermilt constituted a lack of "reasonable effort." The appellant stresses that the D.H.S. failed to make such reassignment even after it was recommended by Dr. Hewitt and Ms. Taylor.[17]

We agree that the deteriorating relationship between the appellant and Ms. Laudermilt rendered complete cooperation unlikely. The D.H.S. together with all other entities involved in a child abuse and neglect case must bear in mind always its obligation to provide a cooperative, encouraging, and supportive environment designed to foster the eventual reconciliation of parent and child. Such an environment is important not only because it is what the law requires, but also because—in the event improvement is inadequate and termination must eventually be sought—the record can better support a conclusion that all reasonable efforts were made by the D.H.S., the other helping personnel, and the court. We believe that certainly once a D.H.S. caseworker and client's relationship deteriorates to the degree evidenced in the present case by a physical altercation and subsequent assault charges and involuntary commitment, the D.H.S. has an obligation to consider changing assigned workers if at all possible, within the parameters of the agency's resources and obligations. However, we recognize that the steady erosion of child protective services resources has created an enormous unmet need and earnestly hope the Legislature and D.H.S. will address this crisis.[18]

17. The appellant also contends that the D.H.S. failed to make a reasonable effort to provide the appellant with a thorough understanding of the legal status of each of her children. It is clear, however, that the appellant did have legal representation throughout these proceedings.

■ In ascertaining the degree of "reasonable effort" made by the D.H.S., however, we must also consider the appellant's role in the proceedings and her response to efforts made by the D.H.S. The appellant was provided with a variety of other caseworkers and therapists on whom she could have relied and to whom she could have demonstrated her willingness and desire to reunify her family. From review of the record, it appears that the appellant completely refused to cooperate with the D.H.S. during her improvement period. In an attempt by the D.H.S., for instance, to assist the appellant in controlling her violent mood swings, the D.H.S. scheduled several appointments for the appellant with Northern Panhandle Behavioral Health Center, a community mental health services provider. While the appellant finally attended an initial evaluation, she refused to return for subsequent appointments.

Furthermore, Ms. Laudermilt testified that the appellant often refused to visit her children or would be late for visitation. At visits specifically scheduled for three and one-half hour duration, for instance, the appellant would frequently appear for the visit one hour late. The appellant would also cancel visitation with Carlita, stating that if she could not see all of her children, she did not wish to see any of them.

A parent's level of interest in visiting with his or her child during an out-of-home improvement period is an extremely significant factor for the circuit court to review. A parent who consistently demonstrates a desire to be with his child obviously has far more potential for being a nurturant and committed parent than one whose interest in being with his child is erratic.

Outreach workers from Northern Panhandle Behavioral Health Center were scheduled to visit the appellant in an attempt to educate her regarding parenting and homemaking skills. When the workers would appear for the appointments, the appellant would not answer the door. Even after the workers left notes on the door with information regarding the scheduling of appointments, the appellant refused to participate in the program. Attempts by the D.H.S. to involve the appellant in a mothers' support group also failed. Ms. Laudermilt accompanied the appellant to the first meeting, but the appellant refused to return to additional meetings.

The D.H.S. also encouraged the appellant to participate in a variety of other activities designed to increase her ability to effectively care for her children. The appellant, however, refused to cooperate with such attempts. We do not believe that the lack

18. In the present case, Ms. Laudermilt testified that she suggested such a reassignment, but that her supervisor declined to effect it, stating that he knew the appellant and that she would not change. Furthermore, the reality of the situation is that some counties in this state have almost no child protective services. According to the May 1991 Child Protective Services Report prepared by the Program Specialist for Child Protective Services in the Office of Social Services for Secretary Miller and Commissioner Panepinto, Region I employs 55 child protective service workers for the 16 county region, Region II employs 41 child protective service workers for the 11 county region, Region III employs 16 child protective service workers for the 15 county region, and Region IV employs 35 child protective service workers for the 13 county region.

In a letter dated January 14, 1991, to personnel working in the child protective services field, Harry Burgess, Director, Office of Social Services of the West Virginia Department of Health and Human Resources explained that interim measures for case prioritization had been established in response to what he termed "the crises in child protective services." The interim measures were effectuated in response to a steady increase in referrals of child abuse and neglect cases and a corresponding reduction in staff which has occurred over the past ten years.

The interim measures recognized that the department had inadequate resources to adequately meet the needs of its clients and established a system for setting priorities as to which child abuse and neglect reports would be fully investigated and followed up.

According to a memorandum dated July 5, 1991, to the Social Service Management Team, Kathie King, Program Specialist in Child Protective Services, indicated that the number of pending referrals is climbing (3,724 as of April 1991). Many of that backlog have not yet been investigated. The department is currently receiving approximately 993 reports of suspected child abuse and neglect each month.

of cooperation exhibited by the appellant is attributable in its entirety to the adverse relationship between the appellant and Ms. Laudermilt. The record reflects the appellant's almost complete disregard for and disinterest in the efforts of the D.H.S. to assist her in developing the control and skills necessary to regain her children. Whether the result of apathy, misunderstanding, or ignorance on the part of the appellant, the ultimate termination of her parental rights was attributable to her behavior rather than to any lack of reasonable effort by the D.H.S.

Despite the responsibility of the D.H.S. and the court to provide interventive resources and to aid the parents, the rehabilitation envisioned by an improvement period is not a task which anyone can accomplish *for* the parent. The natural parental instinct is to do the work necessary to regain full custody of the child. Evidence of that instinct and the concomitant energy required to achieve that goal is missing from this case.

■ In the difficult balance which must be fashioned between the rights of the parent and the welfare of the child, we have consistently emphasized that the paramount and controlling factor must be the child's welfare. "[A]ll parental rights in child custody matters," we have stressed, "are subordinate to the interests of the innocent child." *David M.*, 182 W.Va. at 60, 385 S.E.2d at 916. Syllabus point 1 of *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980), in part, states the following:

As a general rule the least restrictive alternative regarding parental rights to custody of a child under *W.Va.Code*, 49–6–5 [1977] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare

of the child will be seriously threatened....

We therefore conclude the improvement periods and the family case plans were more than adequately developed and implemented to assist the mother in the steps needed to remedy the problems which gave rise to these proceedings, and we find no merit to her assignment of error related thereto.

## VI. EMOTIONAL INSTABILITY

■ The appellant also contends that the lower court erred by finding, as part of its determination that her parental rights should be terminated, that she suffered an emotional illness of such duration or nature as to render her incapable of exercising proper parenting skills or sufficiently improving the adequacy of such skills. *See* W.Va.Code § 49–6–5(b)(6).[19] The appellant argues that only one alleged incident of physical abuse, the hand print on the child caused by a slap, occurred during the one and one-half year period during which the appellant had exclusive care of Carlita. The appellant further contends that the reports of Dr. Maceiko and Dr. Hewitt do not prove, by clear and convincing evidence, that she suffers an emotional illness of such nature or duration as to render her incapable of exercising proper parenting skills or sufficiently improving the adequacy of such skills.

Dr. Maceiko indicated in his October 5, 1988, report that Carlita should not be returned to the appellant due to the appellant's unstable psychological and emotional condition, exacerbated by her limited intelligence. Dr. Hewitt, however, recommended in his final report that Carlita be reintegrated into the household. The appellant encourages us to rely more heavily upon the report of Dr. Hewitt and argues that

**19.** West Virginia Code § 49–6–5(b) provides the criteria for determining when there is "'no reasonable likelihood that conditions of neglect or abuse can be substantially corrected.'" Pursuant to § 49–6–5(b)(6), such conditions shall be deemed to exist when "[t]he abusing parent or parents have incurred emotional illness, mental illness or mental deficiency of such duration or nature as to render such parent or parents incapable of exercising proper parenting skills or sufficiently improving the adequacy of such skills."

Dr. Hewitt's report is more thorough and exhaustive than the report of Dr. Maceiko.[20]

The evidence reflects that the appellant suffers violent mood swings which have manifested themselves in both verbal and physical abuse. The appellant kicked the D.H.S. worker in the stomach, was incarcerated for assaulting her own mother, threw Carlita on a bed when the child was five months of age, slapped Carlita, causing a red hand print, when the child was thirteen months of age, has allegedly hit Robert B. on several occasions and has such a turbulent domestic situation that frequent calls to law enforcement authorities are necessary. The record also reflects several instances in which the appellant demonstrated her unwillingness to seek treatment or therapy for her condition.

Dr. Hewitt explained in his April 30, 1988, report that the appellant suffers from "serious personality difficulties with noticeable abusiveness and insensitivity." In his October 5, 1988, report, Dr. Maceiko noted the appellant's anger, poor impulse control, difficulty dealing with stress, and a low frustration tolerance level. Based upon these reports and the testimony contained in the record, we cannot conclude that the lower court erred in finding that the appellant suffers from an emotional disorder of such nature as to render her incapable of exercising proper parenting skills or sufficiently improving the adequacy of such skills.

20. Dr. Maceiko prepared a three-page report on April 10, 1986, and a two-page report on October 5, 1988. Dr. Hewitt examined the appellant on June 24, 1986, July 10, 1986, and December 3, 1987. His entire report consists of thirty-five pages.

21. Pursuant to W.Va.R.Evid. 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, W.Va.R.Evid. 404(b) specifically allows evidence of prior bad acts admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

## VII. PREVIOUS ABUSIVE ACTS TOWARD OTHER CHILDREN

The appellant contends that the circuit court erred in admitting evidence of prior allegations of abuse involving children other than Carlita. Throughout the proceedings, the social service workers, having worked with the family even prior to Carlita's birth, testified with regard to the appellant's treatment of Justin and Christopher. With regard to the appellant's contention that her violent acts toward her other children are irrelevant to the abuse and neglect proceedings regarding Carlita, we disagree with the proposition that acts of abuse and neglect toward other children are inadmissible.

We find that evidence regarding the appellant's previous abuse of Justin was appropriately introduced to serve the broad, legitimate purpose of providing the court with an understanding of the appellant's home environment and of the appellant's propensity toward abusive and/or neglectful treatment of children. We further find that introduction of evidence of this nature in a parental rights termination case is not violative of W.Va.R.Evid. 404(b).[21] While we recognize that the probative value of such evidence may, at some point, be substantially outweighed by its unfair prejudicial impact, that balancing is within the sound discretion of the trial court, and its decision will be reversed only upon a clear abuse of discretion.

We therefore hold that prior acts of violence, physical abuse, or emotional abuse toward other children are relevant in

While W.Va.R.Evid. 404(b) has not typically been employed in the civil context, several jurisdictions, as subsequently discussed in detail in this section, have encountered situations in which parents or guardians accused of abuse or neglect have raised Rule 404(b) as an issue. Those courts have resolved the issue by permitting evidence of other crimes, wrongs, or acts to be admissible for other purposes as referred to in Rule 404(b) "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." A rather permissive approach has been taken toward evidence challenged under Rule 404(b) within the child abuse or neglect context.

a termination of parental rights proceeding, are not violative of W.Va.R.Evid. 404(b), and a decision regarding the admissibility thereof shall be within the sound discretion of the trial court. While evidence of past acts is a relevant factor to be considered, it is not necessarily dispositive and will not necessarily preclude a finding of fitness. Our holding permitting evidence of prior abusive acts is consistent with our previous decisions regarding the admissibility of evidence of prior acts of parents under inquiry in a termination proceeding. For instance, in *Nancy Viola R.*, we encountered a situation wherein the child's father had been convicted of first degree murder of the child's mother. In discussing the admissibility of the father's repeated acts of abuse and violence toward the mother, culminating in her death, we stated that such acts were relevant to the determination of parental fitness and should have resulted in a finding that the father was an unfit custodian for his five-year-old son. 177 W.Va. at 710, 356 S.E.2d at 464. We recognized that spousal abuse is a factor to be considered in determining parental fitness for child custody in *Nancy Viola R.*, as well as in *Collins v. Collins*, 171 W.Va. 126, 297 S.E.2d 901 (1982). We have not, however, prior to this time, had the opportunity to directly address the impact that prior abuse of children other than the one presently under consideration may have upon a determination of parental fitness. However, since prior spousal abuse is an appropriate factor in determining parental fitness, then clearly prior child abuse must be considered even more probative.

In pertinent part of syllabus part 2 of *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990), a criminal case, we held the following:

> Collateral acts or crimes may be introduced in cases involving child sexual assault or sexual abuse victims to show the perpetrator had a lustful disposition towards the victim, a lustful disposition towards children generally, or a lustful disposition to specific other children provided such evidence relates to incidents reasonably close in time to the incident(s) giving rise to the indictment....

Thus, even within the more stringent requirements of the criminal context, we found that certain prior acts are "so intrinsically related to the alleged offenses that they may be considered as part of the transactions with the children and so interwoven with ... [a] pattern of conduct ... that they are part of the *res gestae* of the crimes charged." 183 W.Va. at 649, 398 S.E.2d at 131.[22] This approach is certainly equally applicable in the noncriminal context of a child neglect or abuse case.

Other jurisdictions have also resolved this issue by permitting introduction of evidence regarding prior acts of abuse or neglect against children other than the one whose termination is presently being contemplated.[23] For instance, records of prior neglect cases against the parent were permitted as evidence pursuant to a statute providing for their admissibility in *In re Maria Anthony*, 81 Misc.2d 342, 366 N.Y.S.2d 333 (1975). In response to the parent's objection to the receipt of the prior records as evidence, the court explained

---

**22.** As explained by the Fourth Circuit in *United States v. Masters*, 622 F.2d 83 (4th Cir.1980), past bad acts may be admissible to provide a full presentation of a case, to provide a setting or environment, or to provide an immediate context or "res gestae," where the "uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other ...' [and is thus] part of the res gestae of the crime charged." *Id.* at 86 (citing *United States v. Beechum*, 582 F.2d 898, 912 n. 15 (5th Cir.1978), *cert denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)).

**23.** *See* e.g. *S.C. v. State*, 471 So.2d 1326 (Fla.Dist. Ct.App.1985) (parent's past conduct with respect

to other children relevant); *In re Schmeltzer*, 175 Mich.App. 666, 438 N.W.2d 866 (1989) (manner of parental treatment of one child probative of how parent will treat another); *In re S.*, 66 Misc.2d 683, 322 N.Y.S.2d 170 (1971) (evidence of previous child abuse case properly admitted in proceeding initiated to remove a newborn from its parents); *In re A.M.A.*, 439 N.W.2d 535 (N.D.1989) (evidence of prior abuse may be considered on whether abuse will continue); *In re R.W.B.*, 241 N.W.2d 546 (N.D.1976) (evidence of prior termination proceedings relating to earlier child of same parents relevant and admissible).

that prior records of neglect or abuse will not, standing alone, determine the present condition of the parent. *Id.* 366 N.Y.S.2d at 335. However, pursuant to statute, proof of previous abuse or neglect is admissible on the issue of present abuse or neglect. *Id.*

The principle underlying the *Maria Anthony* decision was expressed succinctly in § 1046(a)(1) of the New York Family Court Act. The same principle, however, is equally applicable even in the absence of such a clear statute.[24] In *In re S.G.*, 153 Vt. 466, 571 A.2d 677 (1990), for instance, the Supreme Court of Vermont held that evidence of similar prior abuse of a sibling was admissible as relevant to the nature of the home environment directly impacting the well-being of the infant in question. 571 A.2d at 681.

In *S.G.*, the testimony of a former social worker indicating that the appellant had abused her other child four years earlier was admitted over objection in the lower court. *Id.* 571 A.2d at 681. The appellant argued that such evidence of a prior bad act was barred by Vermont Rule of Evidence 404(b),[25] or, in the alternative, that its prejudicial effect outweighed its probative value. The appellant's defense in *S.G.* had been based upon the premise that the injury to the child then under consideration, a fracture of the right tibia of a two-month old infant, was caused by an accident. The social worker's testimony was presented to counter that defense and to prove that the mother's other child had suffered an unexplained fracture to her right arm four years earlier. *Id.*

In holding that Vt.R.Evid. 404(b) did not preclude such evidence, the court cited its previous holding in *In re R.M.*, 150 Vt. 59, 549 A.2d 1050 (1988), and explained that evidence of previous abuse of other children was admissible in *In re R.M.* because it was " 'indicative of a broad pattern of abuse and neglect generally pervasive in this household and clearly relevant to *R.M.*,' " *Id.* 571 A.2d at 680, (quoting *R.M.*, 549 A.2d at 1056). The prior bad act evidence was also admitted in *R.M.* to provide insight into the home environment rather than to demonstrate that the mother acted in conformity with any particular character trait. *Id.* "[T]he issue in juvenile proceedings is not whether the parent did a particular act or acted in conformity with a particular character trait but instead whether the child has proper care and his or her well-being is protected." *Id.* 571 A.2d at 681. Permitting evidence of prior bad acts in abuse and neglect proceedings, the court held, was "unique to juvenile proceedings because of the breadth of the inquiry and focus on the child." *Id.*

In the present case, the appellant's propensity toward violence and emotional instability, as revealed throughout the record and particularly with regard to her relationship with her other children, is relevant to a determination of her fitness and is probative of her present ability to provide a stable and permanent home for Carlita. We fail to perceive any error by the circuit court in allowing the introduction of evidence regarding the appellant's prior acts of physical and emotional abuse.

Based upon the foregoing, we affirm the decision of the Circuit Court of

---

**24.** By way of comparison, in regard to other children of the accused parent, guardian or custodian, W.Va.Code § 49–6–3(a) (1986) provides the following, in pertinent part:

In a case where there is more than one child in the home, the petition shall so state, and notwithstanding the fact that the allegations of abuse or neglect may pertain to less than all of such children, each child in the home for whom relief is sought shall be made a party to the proceeding. Even though the acts of abuse or neglect alleged in the petition were not directed against a specific child who is named in the petition, the court shall order the removal of such child, pending final disposition, if it finds that there exists imminent danger to the physical well-being of the child and a lack of reasonably available alternatives to removal.

This section was amended in 1988 without change to the portion quoted above.

Clearly, the tenor of this statute is that abuse or neglect of one child may indicate similar conduct toward another child.

**25.** West Virginia Rule of Evidence 404(b), Federal Rule of Evidence 404(b) and Vermont Rule of Evidence 404(b) are virtually identical.

Ohio County. With regard to future disposition of Carlita and her siblings, the record is unclear as to whether Carlita enjoys any continued association with her siblings, Justin, Christopher, and Daniel. In syllabus point 4 of *In re James M.*, No. 19948 185 W.Va. 648, 408 S.E.2d 400 (1991), we explained the following:

> In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.

Consequently, we encourage the D.H.S. to work with any temporary or permanent foster families or adoption placements involved in the custody of these siblings to endeavor to facilitate the children's continued association with one another.

Affirmed.

MILLER, Chief Justice, concurring:

My colleague, Justice Workman, has authored a comprehensive and superb opinion in regard to the handling of termination of parental rights cases. Hopefully, it will become the bible not only for our circuit courts, but for all who are involved in this sensitive and difficult field.

I have in the past been critical of this Court's broadening of the use of Rule 404(b) of the West Virginia Rules of Evidence in criminal cases, as outlined in Part II of my dissent in *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123, 143 (1990). However, I join in Syllabus Point 8 of the majority opinion in this case, which states:

> "Prior acts of violence, physical abuse, or emotional abuse toward other children are relevant in a termination of parental rights proceeding, are not violative of W.Va.R.Evid. 404(b), and a decision regarding the admissibility thereof shall be within the sound discretion of the trial court."

In addition to the reasons set out in the majority's opinion justifying the use of Rule 404(b) evidence, I would point out that termination of parental rights cases are heard only by the judge. Consequently, there is not the same possibility of unfair prejudice as when Rule 404(b) evidence of other crimes, wrongs, or acts are paraded before the jury in a criminal case. Certainly, the penal consequences are not as severe in a parental rights termination case as in a criminal case. Therefore, the general balancing test under Rule 403 of the West Virginia Rules of Evidence, which applies to Rule 404(b) evidence, *see State v. Hanna*, 180 W.Va. 598, 378 S.E.2d 640 (1989), is less strict.