IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2020 Term

_____

No. 19-0926

_____

**FILED**
**October 30, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: M.M., H.M., AND W.M.

_____

Appeal from the Circuit Court of Randolph County
Honorable Jacob E. Reger, Judge, sitting by special assignment
Juvenile Action Nos. 18-JA-119, 120, and 121

REVERSED AND REMANDED WITH DIRECTIONS

_____

Submitted: September 1, 2020
Filed: October 20, 2020

J. Brent Easton, Esq.
Brent Easton Attorney at Law PLLC
Davis, West Virginia
Counsel for Petitioner Mother

Timothy H. Prentice, Esq.
Prentice Law Office
Elkins, West Virginia
Guardian ad Litem

Patrick Morrisey, Esq.
Attorney General
Charleston, West Virginia
Lee A. Niezgoda, Esq.
Assistant Attorney General
Fairmont, West Virginia
Counsel for Respondent W.Va. Dept.
   of Health and Human Resources

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS**

1. "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

2. "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child." Syl. Pt. 6, *In Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

i

3. "The purpose of the family case plan as set out in W. Va. Code, 49-6D-3(a) (1984) [subsequently amended and later re-codified into W. Va. Code § 49-4-408 (2015) and § 49-4-604 (2020)], is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." Syl. Pt. 5, *State ex rel. W. Va. Dept. of Human Services v. Cheryl M.*, 177 W. Va. 688, 356 S.E.2d 181 (1987), superseded by statute on other grounds as stated in *State ex rel. Virginia M. v. Virgil Eugene S. II,* 197 W. Va. 456, 461 n.9, 475 S.E.2d 548, 553 n.9 (1996).

4. Pursuant to West Virginia Code § 49-4-604(f) (2020), in an abuse and neglect case "[t]he court may not terminate the parental rights of a parent on the sole basis that the parent is participating in a medication-assisted treatment program, as regulated in [W. Va. Code] § 16-5Y-1 *et seq.*, for substance use disorder, as long as the parent is successfully fulfilling his or her treatment obligations in the medication-assisted treatment program."

5. The use of medication-assisted treatment is authorized by the Medication-Assisted Treatment Program Licensing Act, West Virginia Code §§ 16-5Y-1 to 16-5Y-13 (2016), and the Act's supporting regulations. Medication-assisted treatment will not be appropriate or beneficial for all persons suffering from opioid use disorder. However, when medication-assisted treatment is appropriate and potentially beneficial, any bias against its use is contrary to the public policy of this State as announced by the Legislature.

**HUTCHISON, Justice:**

The Petitioner Mother, M.M.-1, appeals the August 27, 2019, disposition order of the Circuit Court of Randolph County that terminated her parental rights to her children M.M.-2, H.M., and W.M.[1] The petitioner contends that the circuit court erred in terminating her parental rights upon finding that she failed to successfully complete the terms of her post-adjudicatory improvement period and that there was no likelihood the circumstances of abuse and neglect could be remedied in the near future. She argues that she was doing very well in her improvement period until the Respondent West Virginia Department of Health and Human Resources ("Department") suddenly discontinued payment for the medication-assisted substance abuse treatments that had been approved for her use as part of her improvement period and family case plan. The children's guardian ad litem supports the petitioner's appeal. However, the Department contends that the circuit court properly terminated the petitioner's parental rights.

Having considered the parties' arguments, the appendix record on appeal, and the pertinent authorities, we conclude that under the facts of this case, the Department's act of stopping payment for the petitioner's substance abuse treatments violated the Department's obligations to follow the approved family case plan and to make reasonable

---

[1]Because this case involves minors and sensitive matters, we follow our longstanding practice of using initials to refer to the children and the parties. *See, e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n. 1 (1990). The Petitioner Mother and one of her children have the same initials, so the petitioner is referenced herein as "M.M.-1" and the child as "M.M.-2."

efforts to preserve the family. We also disapprove of the bias against medication-assisted substance abuse treatment that was evident in this case. As such, the circuit court erred in concluding that the petitioner failed to comply with the terms of her improvement period and in terminating the petitioner's parental rights on the same grounds. We reverse and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. Facts and Procedural Background

On August 25, 2018, at around 12:30 p.m., the petitioner's husband, I.M., was found "passed out" behind the wheel of a running car parked in the parking lot of a pizza restaurant where the petitioner was working. The windows were rolled up and the vehicle's heater was turned on during the summer day, causing the car to be very hot inside. The couple's two-year-old child, W.M., was in the back seat of the car. The police were called and W.M. was taken to a hospital for heat exhaustion. I.M. appeared to be under the influence of drugs, and drugs were found inside the car. The petitioner was not in the car at the time, but she came outside of the restaurant when she noticed the commotion in the parking lot. In the course of an investigation, both the petitioner and I.M. admitted that they were addicted to drugs. The petitioner admitted that she would test positive for either Suboxone or methamphetamine and it was likely that drugs would be found in their home. She explained that she had been going to a medication-assisted treatment ("MAT") center

in Morgantown until her car broke down and she was no longer able to travel to the center, resulting in a relapse of her use of illegal and illegally obtained drugs.[2]

On September 11, 2018, the Department filed a petition in circuit court alleging that the petitioner and I.M. were suffering from drug and/or alcohol addictions that created an abusive and neglectful situation for their children.[3] On October 2, 2018, both parents stipulated to abuse and neglect. The circuit court granted each parent a six-month post-adjudicatory improvement period.

One term of the petitioner's improvement period was that she had to enter an in-state drug treatment program approved by the multidisciplinary treatment team ("MDT").[4] In developing a case plan for the family, the MDT agreed that the petitioner

---

[2] "'Medication-assisted treatment' means the use of medications and drug screens, in combination with counseling and behavioral therapies, to provide a holistic approach to the treatment of substance use disorders." W. Va. Code § 16-5Y-2 (2018).

[3] The Petitioner and I.M. have two young children together, W.M. and H.M. The circuit court ratified the Department's emergency removal of W.M. from the home, and W.M. was temporarily placed with his paternal grandmother. H.M. was already living with maternal relatives in Pennsylvania pursuant to the terms of a custody order entered in that state; the genesis of that custodial arrangement and the terms of the Pennsylvania order are not set forth in the appendix record. The petitioner also has a teenaged child, M.M.-2, with an unknown father; M.M.-2 has resided with her maternal grandparents for many years without any formal custody arrangement. Both H.M. and M.M.-2 have continued living with those same relatives throughout this abuse and neglect proceeding.

[4] Members of an MDT include, inter alia, the Department's case worker, the respondent parents and their counsel, the prosecuting attorney who is counsel to the Department, and the children's guardian ad litem. W. Va. Code § 49-4-405(b) (2015).

would satisfy the drug treatment requirement by receiving MAT at the Clarksburg Treatment Center.

During a status hearing on January 3, 2019, Assistant Prosecuting Attorney Christina Harper, who was appearing on behalf of the Department, informed the circuit court that both parents had been participating in their respective improvement periods and both were "doing well." Ms. Harper reported that all of the petitioner's drug screens since she began the improvement period had been clean of all substances except Buprenorphine, which was the prescription medication she was taking as part of the MAT program. Ms. Harper advised the circuit court that the petitioner was also receiving counseling at the Clarksburg Treatment Center and was attending supervised visits with her children.[5] The petitioner's counsel presented the court with a December 28, 2018, note written by the petitioner's doctor at the Clarksburg Treatment Center advising that the petitioner was complying with her treatment, counseling, and drug screens.

With regard to the Department's policy about drug treatment, during the January 3, 2019, hearing Assistant Prosecutor Harper explained that if a parent is *not* already in an MAT program then the Department asks that they not begin one as part of an improvement period. However, if they *are* already participating in MAT, the Department

---

[5] According to the record, the petitioner was granted supervised visitation with her children twice a week for two hours a day. It is unclear from the record whether the visitation arrangements included all of her children.

allows them to continue so long as the program is in-state and is Medicaid-approved. Ms. Harper noted that the petitioner was already participating in MAT and thus the Department wanted her to continue to follow a doctor's recommendations. Ms. Harper explained, "[w]e have been hesitant to dictate that they titrate off of that." Ms. Harper also informed the circuit court that the Department had provided the petitioner with a special medical insurance card to pay for the MAT treatments:

> I know there has [sic] been some issues with Clarksburg Treatment Center working out her acceptance of her special medical card. She was previously attending that treatment with a medical card. And when the children [were] removed from her care [as part of this abuse and neglect case], she did lose eligibility. Mr. Desilva [of the Department] did issue a special medical card and, you know, he has done everything he can in – to assist in that matter.

At the next status hearing on March 11, 2019, the circuit court was once again told of the petitioner's successful efforts in her improvement period. In addition to drug screens at the Clarksburg Treatment Center, she had also been reporting for random drug screens at North Central Community Corrections and her screens were clean of all substances except the prescribed MAT medication. The improvement period was continued, and another status hearing was scheduled for April 8, 2019.

Sometime in late March or early April 2019, the petitioner's special medical card expired and the Department refused to renew it. Her employment income, coupled with the fact that W.M. had been removed from her home, left her ineligible for regular Medicaid coverage. Because her income was limited, the petitioner was unable to afford

5

the MAT treatments and counseling. Thus, she was not able to obtain any further substance abuse treatment from the Clarksburg Treatment Center.

At the April 8, 2019, hearing, Ms. Harper reported that the petitioner had recently been struggling in her improvement period. The petitioner had failed to appear for random drug screens at North Central Community Corrections, and when she did appear on April 4, she potentially tested positive for methamphetamine. The petitioner denied that she had used methamphetamine, and the court was advised that the April 4 sample was going to be re-tested. (According to the transcript of a subsequent hearing, the April 4 test result was later deemed to be a false positive.) With respect to the special medical card, Ms. Harper told the circuit court the following:

> Mr. Easton [the petitioner's counsel] did advise me before we started the hearing that [the petitioner] was previously getting Suboxone[6] from the Clarksburg Treatment Center on a special medical card. When that medical card ran out, she was cut off from the Clarksburg Treatment Center and was no longer able to do that. I was unaware that she had been issued a special medical card by the prior worker in this case which is not, in fact, appropriate. The Department doesn't issue medical cards for Suboxone treatment in the programs. So, um, you know, we're not – the Department is not able to issue her another special medical card and should not have done so in the first place.

---

[6] It is unclear from the record whether the petitioner was taking Suboxone, which is a medication comprised of both Buprenorphine and Naloxone, or just Buprenorphine alone. *See* https://www.suboxone.com (retrieved Aug. 27, 2020) (specifying composition of Suboxone). During the various hearings, the lawyers used these drug names interchangeably.

(footnote added). Thus, even though Ms. Harper had explained the issuance of the special medical card and its purpose to the circuit court at the January 3 hearing, on April 8 she denied knowing anything about it and represented that its issuance had been improper.[7] She also admitted that the petitioner had been "cut off" from her drug treatments during the improvement period. There was no information presented at this hearing about any other substance abuse treatments or counselling that might have been available to the petitioner.

Arguing that the medical insurance coverage had been halted without any warning or opportunity for the petitioner to taper off the prescribed medication, the petitioner's counsel asked the circuit court to order the Department to renew the special medical card. The petitioner's counsel also requested a three-month extension in the post-adjudicatory improvement period. The children's guardian ad litem had no objection to the extension or to the renewal of the medical card. The guardian ad litem agreed with the petitioner that it was unfair to stop the substance abuse treatments without warning, when the petitioner could not personally afford to pay. Noting that the petitioner had previously been doing well, the Department had no objection to extending the improvement period; however, the Department objected to renewing the special medical card.

---

[7] Later during the same hearing, Ms. Harper represented that while she had known that the petitioner was going to an MAT center, she was "not aware that she was receiving that treatment on a special medical card." We presume that Ms. Harper simply had a lack of recollection about the prior proceedings in this case and was mistaken, but nevertheless, her representations to the circuit court were inaccurate.

When considering these motions, the circuit judge stated that "I always have a problem with people being on Suboxone to begin with and that's my position." Although there was no evidence in the record regarding how long the petitioner had been taking MAT prescription medication prior to this abuse and neglect case, the lawyers and judge discussed that she had been doing so for five years. The judge stated,

> Suboxone was not introduced to, in my opinion, be a long-term treatment type situation for [people]. You know, it is hard for me to sit up here and order the Department to make them give her a special medical card for Suboxone when she has been using Suboxone for five years. Mr. Easton . . . I am not unsympathetic to her situation. I mean, she's addicted to Suboxone now. That's the problem. But it's not because of the Department. She was addicted to Suboxone before this case ever got started it sounds like.

There was then a discussion among the judge and lawyers about whether the Clarksburg Treatment Center had a plan to eventually get the petitioner titrated off the MAT medication. No evidence was presented regarding this issue. However, the judge expressed his opinion as follows:

> Well, they probably didn't have one has been my experience, that their plan is to keep her on Suboxone because she keeps coming and seeing them and they keep prescribing them for her. That's been my observation. I know at the Chestnut Ridge they have that program with psychologists that have treatment involved with it. But most of the other Suboxone-type treatment situations that I know about is they are buying prescriptions. And it sounds to me like that's what is going on in Clarksburg.

At the conclusion of the hearing, the circuit court granted the three-month extension of the petitioner's post-adjudicatory improvement period but refused to order the Department to renew the special medical card.

8

Another status hearing was held two months later on June 3, 2019. Ms. Harper reported that the petitioner "still has not been visiting or fully participating in her improvement period." The petitioner's counsel reported that because the MAT treatments had been stopped so suddenly when the Department withdrew funding, the petitioner was having difficulty weaning herself off the medication. He reported that since the last hearing, the petitioner had failed a drug test by testing positive for methamphetamine.[8] Arguing that the only "safe and proper way to come off of [the drugs used in MAT] is through a controlled system with a physician," the petitioner's counsel once again made a verbal motion to the circuit court seeking an order requiring the Department to provide medical coverage. The circuit court again refused the motion. The court referenced the petitioner's recent positive test for methamphetamine and stated that MAT is used for the treatment of opioid addiction, not methamphetamine addiction. The court added that

> it's unfortunate that people get addicted to Suboxone, and it sounds to me like that is what has happened with your client. I am not going to require the Department to provide her a medical card so she can continue to use it, because it seems to me that what happens is people become addicted – I mean, I've heard it described that it's harder for them to get off Suboxone than it is Heroin.

The improvement period was allowed to continue for the remaining one month, and a disposition hearing was scheduled for July 22, 2019.

---

[8] Counsel was referencing a drug test administered on May 23, 2019.

9

During the July 22 disposition hearing, there was evidence that all of the petitioner's drug tests administered at North Central Community Corrections had been negative for any drugs other than her prescribed MAT medication up through May 23, 2019. On that date, she tested positive for methamphetamine, amphetamine, and Buprenorphine. The petitioner failed to appear for any drug screens after May 23, 2019. After May 16, 2019, the petitioner stopped participating in supervised visitation with her children, even though she had not missed any of the prior visits, and she stopped attending parenting and adult life skills classes. When questioned by petitioner's counsel, the Department's caseworker acknowledged that participation in MAT at the Clarksburg Treatment Center was a condition of the petitioner's improvement period and that after the Department refused to renew the special medical card, the petitioner was left to pay for these treatments herself.[9] The caseworker suggested that the MDT had discussed other

---

[9] During the disposition hearing, the following exchange took place when the Department's caseworker was questioned by petitioner's counsel:

> Q. Ms. Webley, . . . do you recall that one of the terms of the improvement period was that [the petitioner] participate in the Buprenorphine program in Clarksburg Treatment Center?
> A. Yes.
> Q. Okay. And so is it your recollection that at the beginning of that treatment program, the Department agreed to fund that treatment?
> A. I was not aware of that. I was not the worker at that time.
> Q. Okay. Are you aware of the fact that at the six-month point in the improvement period, the Department determined that it would not fund that [MAT] treatment?
> A. Yes.
> Q. Okay. So, at that point, that left [the petitioner] to figure out how to fund that treatment on her own, is that correct?

"detox" options with the petitioner, but she provided no specifics and it is unclear from the record when such discussion might have taken place.

---

A. Correct.

Q. But up until that six months, the Department had been providing that financially, correct?

A. I think she was given a special medical card, yes.

Q. Okay. So was it your understanding that she didn't qualify for a medical card on her own due to her income?

A. Yes.

Q. Why was she given a special medical card to begin with if she didn't – if the Department wouldn't provide it after six months?

A. I am not sure. Like I said, I wasn't the worker at the time. We usually give special medical cards when they are denied a regular medical to help with certain services.

Q. Does the Department have a policy whereby special medical cards were not issued for Suboxone or Buprenorphine treatment in general?

A. Yes.

Q. But, to your understanding, she was issued one of those cards at the beginning of the improvement period?

A. Yes.

Q. For that purpose; is that correct?

A. Correct.

Q. Okay. So was the Department's position that after the six month period, it was up to [the petitioner] to fund the Buprenorphine treatment on her own?

A. When I took over the case, she had contacted me about her medical card not working due to expiring. And that's when I informed her she could not get a medical card for Buprenorphine.

Q. So, to your understanding, because she could no longer afford one on her own, the treatment at Clarksburg Treatment Center – was denied treatment at that center, correct?

A. Correct.

Q. Okay. So, after six months, she was basically left without a term of the improvement period that she had basically been previously been provided by the Department, at least financially speaking?

A. Correct.

11

The Department asked the circuit court to rule that the petitioner had failed to complete her post-adjudicatory improvement period and to terminate her parental rights to the children. By counsel, the petitioner objected and argued that she had performed very well in the improvement period until the Department ceased funding the substance abuse treatments and counseling that were previously approved for her. After hearing evidence and arguments, the circuit court found that the petitioner violated the terms of her improvement period by testing positive for methamphetamine on May 23, 2019; by missing thirteen random drug screens since May 23, 2019; and by missing visitation with her children and parenting skills classes since May 16, 2019. Accordingly, the circuit court concluded that there was no likelihood that the circumstances of abuse and neglect could be remedied in the near future and ordered that the petitioner's parental rights be terminated. These findings were reflected in a written order entered on August 27, 2019, from which the petitioner now appeals.

After full appellate briefing, the parties appeared for oral argument before our Court on September 1, 2020. During oral argument, Assistant Attorney General Lee A. Niezgoda, appearing on behalf of the Department, reported that some of the information given to the circuit court about the Department's MAT policy had been mistaken. She represented that the Department's policy permits payment for MAT if the treatment is provided through an in-state, Medicaid-approved program. According to Ms. Niezgoda, when the petitioner sought to renew her special medical card, a Department supervisor had mistakenly thought that the petitioner was obtaining treatment outside of West Virginia

12

and therefore had denied the request. Ms. Niezgoda informed this Court that it would not have been against the Department's policy to renew the petitioner's special medical card.

## II.  Standard of Review

Our standard of review of a circuit court's order terminating parental rights is well-settled.

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). In addition, the question of whether the petitioner was successful in her post-adjudicatory improvement period is critical to this appeal. With regard to improvement periods, our Court has said:

> At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, *in the court's discretion*, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

Syl. Pt. 6, *In Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991) (emphasis added). Thus we review a circuit court's factual decisions regarding the completion of an improvement period for abuse of discretion. With these standards in mind, we consider the parties' arguments.

### III. Discussion

The petitioner argues that the circuit court erred in finding that she was unsuccessful in her improvement period inasmuch as she was doing well until the Department suddenly discontinued payment for her MAT, a service that had been provided as a term of her improvement period and family case plan. Furthermore, she contends that it was error for the circuit court to have terminated her parental rights on this same basis. Under the particular facts of this case, we agree with the petitioner.

Whenever a court determines that a child has been abused or neglected, the Department and the MDT are required to develop a child and family case plan.[10] West Virginia Code § 49-4-604 (2020) specifies many requirements for the case plan, including that, "at a minimum," there must be a discussion of

> how the agency which is responsible for the child plans to assure that the child receives proper care and that *services are*

---

[10] *See* W. Va. Code § 49-4-408(a) (2015) ("The Department . . . shall develop a unified child and family case plan . . . ."); W. Va. Code § 49-4-408(b) ("The department shall convene a multidisciplinary treatment team, which shall develop the case plan."). *See supra* n.4 (identifying some members of MDT).

14

*provided to the parents*, child, and foster or kinship parents *in order to improve the conditions that made the child unsafe in the care of his or her parent(s)* . . . .

*Id.* at § 49-4-604(a)(1) (emphasis added). This statute also requires the Department to make "reasonable efforts, with the child's health and safety being the paramount concern, to preserve the family, or some portion thereof, and to prevent or eliminate the need for removing the child from the child's home and to make it possible for the child to safely return home." *Id.* at § 49-4-604(c)(5)(B).[11] Similarly, a different section of the Code directs that the Department "shall develop a unified child and family case plan for every family wherein a person has been referred to the department after being allowed an improvement period or where the child is placed in foster care." W. Va. Code § 49-4-408(a) (2015); *accord* W. Va. Code § 49-4-610(2)(E) (2015) (requiring that an order granting an improvement period must also order the Department to prepare and submit to the court an individualized family case plan in accordance with § 49-4-408).[12]

"The purpose of the family case plan as set out in W. Va. Code § 49-6D-3(a) (1984) [subsequently amended and later re-codified into W. Va. Code § 49-4-408 (2015)

---

[11] This statute also delineates circumstances when the Department is not required to make reasonable efforts to preserve the family, *see* W. Va. Code § 49-4-604(c)(7), but none of those circumstances are present in this case.

[12] West Virginia Code § 49-4-610(2)(E) requires a case plan for a post-adjudicatory improvement period. West Virginia Code § 49-4-610(1)(D) imposes this requirement for a preadjudicatory improvement period, and § 49-4-610(3)(E) imposes this requirement for a post-dispositional improvement period.

and § 49-4-604 (2020)], is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." Syl. Pt. 5, *State ex rel. W. Va. Dept. of Human Services v. Cheryl M.*, 177 W. Va. 688, 356 S.E.2d 181 (1987), superseded by statute on other grounds as stated in *State ex rel. Virginia M. v. Virgil Eugene S. II*, 197 W. Va. 456, 461 n.9, 475 S.E.2d 548, 553 n.9 (1996).[13] The "goal" of the improvement period and family case plan "should be the development of a program designed to assist the parent(s) in dealing with any problems which interfere with his [or her] ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result." *Carlita B.*, 185 W. Va. at 625, 408 S.E.2d at 377.[14]

As the Department's caseworker admitted during her testimony at the disposition hearing, the petitioner's participation in MAT at the Clarksburg Treatment Center was a condition of her post-adjudicatory improvement period. It was to satisfy a

---

[13] The purpose of a family case plan that is set forth in syllabus point five of *Cheryl M.* included a direct quote from the 1984 version of West Virginia Code § 49-6D-3(a), a statute that was subsequently re-written and was then incorporated into West Virginia Code §§ 49-4-408 and 49-4-604. When the statute was re-written, the language quoted in syllabus point five of *Cheryl M.* was not expressly included. Nonetheless, there can be no debate that the sentiment expressed in the syllabus point—the need for an organized, realistic plan to identify and lessen the problems leading to the abuse and neglect—has been incorporated into the directives of the current §§ 49-4-408 and 49-4-604, as quoted above.

[14] While *Carlita B.* was also decided under W. Va. Code § 49-6D-3 (1984), its recognition of the goal of an improvement period and parenting plan is still a correct statement of the current statutory law. *See supra* n.13.

term of the family case plan that had been approved by the MDT. Moreover, during the January 3, 2019, status hearing, the Department's counsel explained how the Department had made arrangements to pay for the treatment via a special medical card in order to assist the petitioner. Under these facts and circumstances, the provision of the special medical card was one way in which the Department was abiding by the case plan and providing services to the petitioner in order to make reasonable efforts to preserve the family and improve the conditions that made the children unsafe in the parents' care. *See* W. Va. Code §§ 49-4-408, 49-4-604. When the Department suddenly reversed course and refused to pay for these services, the petitioner was left without the financial ability to comply with her improvement period and family case plan. This directly undermined the goal of assisting the family.

The Department asserts that pursuant to West Virginia Code § 49-4-610(4)(A) (2015), a parent is responsible for the initiation and completion of all terms of his or her improvement period.[15] This same statute provides that the circuit court "may" order the Department to pay the expenses associated with an improvement period, thus the court is not required to do so. *Id.*[16] Accordingly, the Department argues that the circuit

---

[15] *Accord In re Katie S.*, 198 W. Va. 79, 90, 479 S.E.2d 589, 600 (1996) (recognizing that "[a]lthough the Department is required 'to make reasonable efforts to reunify a family' . . . the parents or custodians have the responsibility 'for the initiation and completion of all terms of the improvement period.'") (internal citations omitted).

[16] West Virginia Code § 49-4-610(4)(A) provides:

17

court did not err when refusing to order the Department to renew the petitioner's special medical card.

While the Department's arguments about West Virginia Code § 49-4-610(4)(A) are true in a general sense, they wholly ignore the particular facts of this case. Here, the Department agreed to pay for these services at the beginning of the improvement period, did pay for the services for six months, and then, without any notice to the petitioner, suddenly stopped payment and forced a halt to the successful substance abuse treatment before the end of the petitioner's post-adjudicatory improvement period. In this particular case, the Department's agreement to pay for the MAT was one way in which it provided services to the family in furtherance of the case plan. The Department's sudden halt to the payment for the petitioner's drug treatment services, and the circuit court's failure to rectify that action, resulted in the Department's failure to make reasonable efforts to preserve the family. Our conclusion is reinforced by the Department's admission during oral argument that, in actuality, there is no agency policy that would prohibit the reissuance of the petitioner's special medical card. As reported by the Department's appellate counsel,

*Responsibilities of the respondent receiving improvement period. –*

(A) When any improvement period is granted to a respondent pursuant to this section, the respondent shall be responsible for the initiation and completion of all terms of the improvement period. The court may order the state department to pay expenses associated with the services provided during the improvement period when the respondent has demonstrated that he or she is unable to bear the expenses.

18

the decision to not renew the card was the result of a misunderstanding by Department staff. With our opinion today, we are not holding that the Department must always pay for a parent's substance abuse treatments in an abuse and neglect case. However, under the specific facts of this case, the Department should have continued paying for these services at least through the end of the extended improvement period.

The Department also argues that even before her special medical card expired, the petitioner was not fully compliant with her improvement period because she missed a few random drug screens at North Central Community Corrections. This position is contrary to the reports given to the circuit court during the January 3 and March 11, 2019, status hearings, where the assistant prosecuting attorney advised that the petitioner was in compliance. Importantly, when ruling that the petitioner failed to comply with her improvement period, the circuit court cited only to the petitioner's conduct *after* the medical card had expired.[17]

We are also troubled by the apparent bias against MAT that was evident during the circuit court hearings. According to the information given during the January 3, 2019, status hearing, the Department's policy either discourages or prohibits the use of MAT for persons who are not already enrolled in an MAT program regardless of whether

---

[17] Moreover, during the appellate oral argument, the children's guardian ad litem explained that it is common for people to miss a few of the random, and numerous, drug screens administered at North Central Community Corrections.

19

the program may be clinically advisable.[18] Additionally, the Department cut off funding for the petitioner's MAT during her improvement period, contrary to what we now know is the agency's policy. Furthermore, the circuit court expressed a personal viewpoint against the use of MAT and, without evidence, theorized that people may be "buying prescriptions" from the Clarksburg Treatment Center.

It is undeniable that drug addiction, including opioid use disorder, has wreaked havoc on thousands of West Virginia families. The Centers for Disease Control and Prevention ("CDC") reports that in 2018, West Virginia had the highest rate of death due to drug overdose in the United States. CDC, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html (last revised Mar. 19, 2020).

As defined in West Virginia law, "'[m]edication-assisted treatment' means the use of medications and drug screens, in combination with counseling and behavioral therapies, to provide a holistic approach to the treatment of substance use disorders." W. Va. Code § 16-5Y-2 (2018). Although MAT will not be the answer for all people who are addicted to opioids, experts have determined that it is a successful treatment option for some. According to the Substance Abuse and Mental Health Services Administration of the U.S. Department of Health and Human Services ("SAMHSA"),

---

[18] It is unclear exactly what the Department's policy on MAT is because a written copy of the policy was never presented to the court.

20

> [r]esearch shows that a combination of medication and therapy can successfully treat these [opioid use] disorders, and for some people struggling with addiction, MAT can help sustain recovery. MAT is also used to prevent or reduce opioid overdose. . . . MAT has proved to be clinically effective and to significantly reduce the need for inpatient detoxification services for these individuals. MAT provides a more comprehensive, individually tailored program of medication and behavioral therapy that address the needs of most patients.

SAMHSA, *Medication-Assisted Treatment (MAT)* (last updated Sept. 1, 2020), https://www.samhsa.gov/medication-assisted-treatment.[19]

In West Virginia, the use of MAT is authorized by the Medication-Assisted Treatment Program Licensing Act, West Virginia Code §§ 16-5Y-1 to 16-5Y-13 (2016). The Legislature determined that allowing MAT in our state meets a need for quality, safe treatment of substance abuse use disorders:

> The purpose of this act is to establish licensing and registration requirements for facilities and physicians that treat patients with substance use disorders to ensure that patients may be lawfully treated by the use of medication and drug

---

[19] The benefits of MAT have also been recognized in various legal journals. For example, one author observed that "[r]esearch signals medication-assisted treatment (MAT) as one of the most successful tools in the fight against OUD [opioid use disorder] and overdose deaths; yet, it is underutilized." Jennifer L. Brinkley, *Opioid Crisis and the Law: An Examination of Efforts Made in Kentucky*, 70 S.C. L. Rev. 741, 745 (2019) (citing Kathryn F. Hawk *et al.*, *Reducing Fatal Opioid Overdose: Prevention, Treatment, and Harm Reduction Strategies*, 88 Yale J. Biology & Med. 235, 237 (2015)."). Indeed, "MAT is considered life-saving medication." Barbara Andraka-Christou, *What Is "Treatment" for Opioid Addiction in Problem-Solving Courts? A Study of 20 Indiana Drug and Veterans Courts*, 13 Stan. J. Civ. Rts. & Civ. Liberties 189, 219–20 (2017) (citing several sources including Robert Schwartz et al., *Opioid Agonist Treatments and Heroin Overdose Deaths in Baltimore, Maryland, 1995-2009*, 103 Am. J. Pub. Health 917 (2013)).

screens, in combination with counseling and behavioral therapies, to provide a holistic approach to the treatment of substance use disorders and comply with oversight requirements developed by the Department of Health and Human Resources. The Legislature recognizes the problem of substance use disorders in West Virginia and the need for quality, safe treatment of substance use disorders to adequately protect the people of West Virginia.

W. Va. Code § 16-5Y-1 (2016). The Department's Secretary is authorized to promulgate rules for MAT programs "to ensure adequate care, treatment, health, safety, welfare and comfort of patients at these [MAT] facilities." W. Va. Code § 16-5Y-13(a) (2016).

Effective March 8, 2019, which was before the disposition hearing was held in this case, the Legislature added a prohibition on the termination of parental rights on the sole basis of a parent's compliant use of MAT. *See* W. Va. Code § 49-4-604(e) (2019), now codified at § 49-4-604(f) (2020). Specifically, the Legislature directed that in an abuse and neglect case,

[t]he court may not terminate the parental rights of a parent on the sole basis that the parent is participating in a medication-assisted treatment program, as regulated in [W. Va. Code] § 16-5Y-1 *et seq.*, for substance use disorder, as long as the parent is successfully fulfilling his or her treatment obligations in the medication-assisted treatment program.

22

*Id.* This prohibition is important inasmuch as the legislative rules promulgated by the Department's Secretary recognize that some people require an ongoing maintenance dose of MAT medication.[20]

Recently, our Court decided an appeal where a mother's parental rights were terminated even though she began an MAT program during the abuse and neglect proceedings. *In re D.J.*, No. 19-0388, 2020 WL 3259627 (W. Va. June 16, 2020) (memorandum decision). We concluded that under the facts of that case, the MDT had good reasons for not approving the use of MAT for the mother, and that there was no error in the circuit court's decision to terminate parental rights based upon the mother's other actions. *Id.* at *9. Nonetheless, we "expressly disapprove[d] of any bias against medication-assisted treatment for substance abuse." *Id.*

---

[20] For example, W. Va. Code R. § 69-12-2 (2019) defines "maintenance treatment" and "maintenance dose" as follows:

> 2.24. Maintenance Treatment – Treatment following induction and stabilization phases of treatment, and means the prescribing of a partial agonist treatment medication at stable dosage levels for a period in excess of twenty-one days in the treatment of an individual for opioid use disorder;

> 2.25. Maintenance Dose – The level of medication-assisted treatment medication considered medically necessary to consistently suppress signs or symptoms of substance use disorders and substance cravings for individuals with a substance use disorder; and is generally administered at the end of the induction period and is individualized for each patient and may gradually change over time[.]

We take this opportunity to formally hold that the use of medication-assisted treatment is authorized by the Medication-Assisted Treatment Program Licensing Act, West Virginia Code §§ 16-5Y-1 to 16-5Y-13, and the Act's supporting regulations. Medication-assisted treatment will not be appropriate or beneficial for all persons suffering from opioid use disorder. However, when medication-assisted treatment is appropriate and potentially beneficial, any bias against its use is contrary to the public policy of this State as announced by the Legislature.

In the present case, the MDT determined that the use of MAT was appropriate for the petitioner. Initially, the circuit court supported and approved this course of treatment. The use of MAT was clearly beneficial for the petitioner because, as the evidence overwhelmingly demonstrates, she was compliant with her improvement period until the Department suddenly stopped paying for the MAT and the treatment was halted. Her random drug test results showed that while receiving MAT, she was clean of all drugs except the MAT medication. She was also visiting with her children, attending parenting classes, and maintaining employment. As soon as the Department pulled the funding, the petitioner's condition took a dramatic downturn. The petitioner was given no notice and opportunity to titrate off the prescribed medication and could not afford to personally pay for the treatments, which obviously resulted in her relapse into substance abuse. Under the facts and circumstances of this case, we conclude that the circuit court abused its discretion when determining that the petitioner failed to satisfy the conditions of her improvement

24

period. The circuit court also abused its discretion when refusing to order the Department to renew the petitioner's special medical card.

West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon "finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. The statute lists scenarios when there is no likelihood of substantial correction in the near future, including if the parent "ha[s] demonstrated an inadequate capacity to solve the problems of abuse or neglect on . . . [her] own or with help" and the parent has "not responded to or followed through [with] the recommended and appropriate treatment" to address a drug addiction. *Id*. at W. Va. Code §§ 49-4-604(d), 604(d)(1). Because the circuit court erroneously concluded that the petitioner had not complied with her improvement period, it was clear error for the circuit court to have terminated the petitioner's parental rights on this basis. Having reviewed this case, we are "left with the definite and firm conviction that a mistake has been committed." *See Tiffany Marie S.*, 196 W.Va. at 226, 470 S.E.2d at 180, syl. pt. 1, in part.

Accordingly, we reverse the August 27, 2019, disposition order and remand this case to the circuit court for further proceedings. The circuit court is directed to reinstate the petitioner's post-adjudicatory improvement period for a period of six months and to order the Department to provide a special medical card to cover her MAT treatments during that time period. During the improvement period, the petitioner and MDT should consult

25

with the petitioner's MAT provider to determine whether she should be titrated completely off the MAT medication or whether a maintenance dose is required.[21] At the end of the improvement period, the circuit court shall determine an appropriate disposition pursuant to West Virginia Code § 49-4-604.

## IV. Conclusion

For the foregoing reasons, the circuit court's August 27, 2019, disposition order is reversed, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

Reversed and Remanded with Directions

---

[21] We remind the parties that if a long-term maintenance dose is prescribed for the petitioner, then the petitioner's parental rights may not be terminated solely on the basis of her participation in the MAT program as long as she is successfully fulfilling her treatment obligations. *See* W. Va. Code § 49-4-604(f).

26