**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **H.P.**

**No. 20-0838** (Webster County 19-JA-6)

**MEMORANDUM DECISION**

Petitioner Mother S.P., by counsel Howard Blyler, appeals the Circuit Court of Webster County's September 15, 2020, order terminating her custodial rights to H.P.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel S.L. Evans, filed a response in support of the circuit court's order. The guardian ad litem, Mary Elizabeth Snead, filed a response on behalf of the child also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her custodial rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The DHHR filed a child abuse and neglect petition against petitioner and her husband in March of 2019. The DHHR indicated that the child's biological parents' parental rights were terminated in 2013 and that petitioner and her husband, the maternal grandparents, adopted the child shortly thereafter.[2] At the time of the adoption, the circuit court ordered petitioner and her husband to prohibit any direct or indirect contact between the biological parents and the child. However, in February of 2019, the child informed a Child Protective Services ("CPS") worker that his biological mother had been residing in the home with him. The CPS worker interviewed petitioner's husband, who claimed that the biological mother was sick and questioned "what else

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]The record indicates that the child has been diagnosed with autism and is significantly developmentally delayed.

could he do?" Petitioner's husband threatened to kill the CPS worker if he attempted to remove the child from the home, and petitioner threatened that they would take the child out of school and go "somewhere that the WV DHHR could not find him." The DHHR informed the child's school that petitioner and her husband were not permitted to pick up the child from school, but petitioner and her husband retrieved the child, and the DHHR reported that their whereabouts were unknown at the time of the petition's filing. The DHHR concluded that petitioner failed to provide a fit and suitable home by allowing the child's biological mother to live in the home with the child and that she failed to protect the child from the biological mother.

The circuit court held a preliminary hearing in March of 2019. CPS workers testified that they responded to petitioner's home following reports that the child's biological mother was living in the home. One CPS worker testified that when petitioner's husband was confronted with the allegations, he became irate and initially denied that the biological mother was living in the home but later admitted that she was in the home. Petitioner's husband also threatened to shoot the worker if she attempted to remove the child from the home. Another CPS worker testified that law enforcement officers responded to the home and found the biological mother inside. Following testimony, the circuit court found that imminent danger existed and continued custody of the child with the DHHR.

In April of 2019, the circuit court held an adjudicatory hearing. The circuit court took judicial notice of evidence presented at the preliminary hearing, as well as during the prior proceedings in which the biological parents' parental rights were terminated. The DHHR also presented the testimony of a teacher and the principal of the child's school, both of whom testified to the child's absences and the instance wherein petitioner removed the child from school after CPS workers' visit to the home. Following testimony, the circuit court adjudicated petitioner as an abusing parent. The circuit court found that it previously prohibited contact between the biological parents and the child, and that petitioner permitted contact to occur. The circuit court further found that petitioner educationally neglected the child by permitting him to have seventy-three absences from school. The circuit court found, "[a]lthough the legislature has expanded what is considered an excused absence, the child still has [seventeen] unexcused absences." Lastly, the circuit court found that petitioner did not testify and, accordingly, "impose[d] an adverse inference."

In December of 2019, the circuit court held an initial dispositional hearing. Barbara Nelson, a licensed psychologist at Saar Psychological group, testified regarding her evaluation of petitioner. During the evaluation, petitioner stated that she was "wrongly accused" of abuse and neglect and that CPS workers had coerced the child into making false allegations against her. Petitioner became agitated during the interview while speaking about CPS and defended the biological mother, despite the fact that her parental rights were terminated. Ms. Nelson testified that petitioner failed to accept responsibility for any of the allegations contained in the petition and further opined that her prognosis for petitioner was extremely poor. She stated that, "[b]ased on that lack of acceptance of responsibility, and hers and [her husband's] blatant disregard of the court's ruling and orders, I found no reason to believe that they would be compliant with any additional services or that those services would be beneficial." Finally, Ms. Nelson testified that petitioner enabled her daughter's presence in their home and contributed to the child missing in excess of seventy days of school.

2

Dr. Megan Green, an independent forensic psychologist from Hudson Forensic Psychology, also testified regarding her evaluation of petitioner. Dr. Green opined that petitioner's motivation for treatment was poor and that she perceived little need for behavioral change. Petitioner minimized the child's involvement with the biological mother. During the evaluation, petitioner acknowledged that CPS workers filed a petition for custody of the child because her husband was allegedly using controlled substances in the home, and she allowed her daughter to visit their home to bring the child gifts. However, Dr. Green testified that there were "glaring inconsistencies" with what petitioner told Dr. Green versus what the child disclosed to her. Dr. Green testified that the child reported regular contact with his mother. Dr. Green's report also indicated that petitioner's prognosis for attaining minimally adequate parenting was poor, largely due to a "history of educational neglect and minimization of the same, exposure of her grandson to circumstances that would foreseeably result in harm, failure to comply with a court order regarding the care of her grandson, her adversarial stance in interactions with DHHR, and failure to acknowledge some referral concerns." Accordingly, Dr. Green testified that she agreed with Ms. Nelson's assessment.

A CPS worker testified that petitioner was receiving services such as parenting classes, counseling, and random drug screening. However, the CPS worker testified that during her interactions with petitioner, petitioner minimized the contact between the child and the biological mother. The worker also reported that petitioner's husband became upset, emotional, and angry during his visits with the child and threatened to "storm off." The worker testified that the DHHR was recommending termination of petitioner's parental rights. Following this testimony, the circuit court continued the hearing.

The circuit court reconvened the dispositional hearing in January of 2020. Petitioner requested an improvement period. A service provider testified that petitioner and the child had a very loving bond and that the child consistently stated he wanted to go home with petitioner and her husband. However, the service provider also testified that she frequently had to redirect petitioner and remind her not to talk about the case during visits with the child. A CPS worker testified that petitioner was compliant with services and submitted to drug screens, which were negative for drugs. The CPS worker opined that petitioner's participation in services had not "changed [her] understanding . . . of what [she has] done wrong in this case."

Petitioner testified that she was willing to comply with the terms and conditions of an improvement period, would keep the child away from the biological mother, shared a strong bond with the child, and had been fully complying with services thus far. Following testimony, the circuit court found that there was sufficient evidence to terminate petitioner's parental rights. The court found that petitioner violated the court's order by permitting the child around the mother and testified falsely. The circuit court further found that petitioner "has failed to accept responsibility for her actions . . . [and] wants to blame everybody for her own inaction and inappropriate action in this case." Nevertheless, the circuit court found that the child had an "extreme bond" with petitioner and granted petitioner an improvement period, the terms of which required that petitioner have no contact with the biological mother, have no one in her residence or in the presence of the child that has a felony conviction or any drug-related conviction, continue attending counseling sessions, submit to drug and alcohol screens, participate in supervised

visitation, and maintain a fit and suitable home because "the condition[] of the home was an issue in this case, and they must maintain a suitable home."

A review hearing was held in May of 2020. A CPS worker testified that petitioner was participating in services and had not submitted a single positive drug or alcohol screen. The CPS worker testified that petitioner was working on the home because "[t]he house had some issues, weak floors, some mold issues, and some cleanliness issues that [she is] working on." In August of 2020, the circuit court held a second review hearing. A CPS worker testified that petitioner was compliant with services. The CPS worker stated that petitioner was participating in parenting classes, submitting to drug screens, attending supervised visitations, and participating in therapy. The CPS worker testified that petitioner "made a couple of improvements" to the home, including fixing "the ceiling where it was falling in, and [she] fixed the floor." However, petitioner needed to improve the cleanliness of the home. The worker testified that the "whole yard has hazards in it" and that the home was extremely cluttered with trash and dirty dishes scattered throughout. The CPS worker opined that it was not fit and suitable for the child at that time. Accordingly, the CPS worker recommended termination of petitioner's parental rights, and the circuit court set the matter for disposition.

The final dispositional hearing was held later in August of 2020. A service provider testified that petitioner was compliant with parenting classes and was setting boundaries with the biological mother. For example, the biological mother stole petitioner's car in May of 2020, and she filed criminal charges against her. Regarding the condition of the home, the service provider testified that "there are days that it is better than others," but that on the bad days "it's more to the extreme of being bad." She explained that there were dangers in the front yard that could hurt the child, including "junk cars" and rusty items with nails. The provider conceded that she recently visited the home and that it was in the best condition it had been in during the proceedings and that there were no safety issues for the child inside the home. The service provider also testified that she was concerned about petitioner's ability to keep up with the child's education as she put little effort into bringing requested items, such as educational worksheets, to the visits. Another service provider testified that the visits went well and that the child enjoyed them.

A CPS worker testified that petitioner had contact with the biological mother in May of 2020 when she and her husband drove her to the hospital to be admitted based on her drug abuse. The worker also testified that petitioner and her husband had difficulty maintaining a suitable home and that, while the conditions of the home had improved, there were still issues with the suitability of the home. The worker testified that petitioner and her husband kept cars in their yard that were precariously held up by blocks, which presented a danger to the child. The worker also testified regarding the strides the child made academically after being removed from petitioner's home. At the time of the petition's filing, the child was unable to read simple, age appropriate books. However, due to the foster parents' efforts, the child was able to read a portion of a book to the worker during her last visit with the child. Based on those issues, the DHHR recommended termination of petitioner's parental rights.

Petitioner's husband testified that he had cars and other equipment in his yard but that it did not prevent anyone from entering the home. He stated, "it's a hobby and I make money on it." Petitioner's husband denied that any of the vehicles were on blocks or in precarious positions. He

testified that he had a sawmill, a bandsaw mill, dozers, and loaders, and that he was teaching the child to work with them. The husband further testified that he made all necessary repairs to the home. He claimed that he "tore the floors out in one room that had a weak floor . . . and replaced all of it, replaced the bed, replaced the floor, replaced the insulation, I put new flooring under it. Done the bathroom, done everything that [the CPS worker] had on that list." The husband admitted to taking the biological mother to the hospital for help with her drug addiction. However, he stated that he dropped her off and told her he could not help her and further pressed charges against her after she stole his car a few days later. Petitioner did not testify.

The circuit court noted that it had sufficient evidence to terminate petitioner's parental rights at the January of 2020 dispositional hearing but refrained from doing so due to the child's extreme bond with petitioner. Testimony at the final dispositional hearing established that petitioner had contact with the biological mother; however, the circuit court said, "I can't overlook the fact that that is [her] daughter under those circumstances. And although there is that technical violation, that in and of itself does not cause me to terminate the rights in this case." Rather, the circuit court explained "when I look at the photographs which have [been] introduced here today, there's no question in my mind that the home is not fit, apt and suitable for this child." The circuit court also expressed concern over the husband's testimony regarding the dangerous activities he and petitioner permitted the child to engage in while in their care given the special needs of the child. The circuit court noted that the child had significantly improved academically since having been removed from the home and responded well in his placement.

The circuit court concluded that petitioner failed to successfully complete her improvement period. Due to the child's bond with petitioner, the circuit court terminated only her custodial rights upon finding that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse or neglect in the foreseeable future and that termination of her custodial rights was in the best interest of the child. Petitioner appeals the September 15, 2020, dispositional order.[3]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

---

[3]The adoptive father's custodial rights were terminated during the proceedings below. The permanency plan for the child is guardianship with the current foster parents.

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in concluding that she failed to successfully complete her improvement period and in terminating her custodial rights based upon the same. Petitioner contends that she complied with and completed the terms and conditions of her improvement period. With regard to the condition of the home, petitioner contends that a CPS worker visited the home just five days prior to the dispositional hearing and testified that she found no safety issues in the home. Petitioner avers that the only issue the worker identified during this visit was the replacement of a heating vent cover. As such, petitioner contends the evidence regarding the condition of her home did not rise to the level of demonstrating it was unfit. Finally, petitioner argues she had an extreme bond with the child and that "some clutter in the household and junk cars in the yard" is not a reason to override a finding that she successfully completed her improvement period or a sufficient justification to terminate her custodial rights.

This Court has held that

[a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991). Further, [i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child. Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014); *see also In re Frances J.A.S.*, 213 W. Va. 636, 646, 584 S.E.2d 492, 502 (2003) ("The question at the dispositional phase of a child abuse and neglect proceeding is not simply whether the parent has successfully completed his or her assigned tasks during the improvement period. Rather, the pivotal question is what disposition is consistent with the best interests of the child."). Lastly, we note that West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate custodial rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the child's welfare. West Virginia Code § 49-4-604(d) provides that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."

In this case, the circuit court did not err in finding that petitioner failed to successfully complete her improvement period. Although petitioner complied with parenting and adult life skills classes, completed therapy, and adequately participated in supervised visits with the child, she failed to demonstrate that she adequately addressed the suitability of his home. Contrary to petitioner's characterization of her home and yard as merely full of clutter or harmless junk cars, the circuit court found that it contained hazardous debris and unstable vehicle that posed a danger

to the child given his special needs. Additionally, while both the service provider and the CPS worker conceded that petitioner's home was in decent condition in the days leading to the final dispositional hearing, testimony established that the home's cleanliness was inconsistent and that when the home was not clean, its condition was extreme. Indeed, the circuit court stated that in viewing the photographs of petitioner's home, there was "no question" that the home was not suitable for the child.

It is also evident that the petitioner failed to acknowledge the extent to which she allowed the biological mother in the home with the child, and that petitioner was at continued risk of putting the child in harm's way. While petitioner is correct that the circuit court did not terminate her custodial rights solely based on her "technical violation" of contacting the biological mother during the improvement period, the circuit court nevertheless properly considered this contact in rendering its decision. Further, the testimony of Ms. Nelson and Dr. Green established that petitioner's prognosis for attaining minimally adequate parenting was poor and that petitioner minimized the extent of her actions. Petitioner failed to recognize issues with the child's truancy and, as of the final dispositional hearing, the testimony established that the child consistently attended school during the school year while in placement with the foster family. The CPS worker and service provider also testified that the child was doing very well in the foster parents' home and had improved academically.

In sum, while petitioner made some changes in order to comply with the requirements of her improvement period, she did not modify her behavior or make sufficient improvement to justify the return of the child to the home. "We have recognized that it is possible for an individual to show compliance with specific aspects of the case plan while failing to improve . . . [the] overall attitude and approach to parenting." *In re B.H.*, 233 W. Va. at 65, 754 S.E.2d at 751 (citations omitted). Such is the case here. While petitioner completed some aspects of her improvement period, "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened." Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). To the extent that petitioner argues that a less-restrictive alternative disposition should have been imposed given the child's extreme bond with her, we note that the circuit court terminated only her custodial rights, leaving her parental rights intact. Despite petitioner's participation in an improvement period and her completion of certain requirements, we find that sufficient evidence existed to support the circuit court's finding that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future and that termination was in the child's best interests. Accordingly, for the reasons set forth above, we find no error in the circuit court's termination of petitioner's custodial rights to the child.

For the foregoing reasons, we find no error in the decision of the circuit court, and its September 15, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: June 22, 2021

7

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton