IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

_____

No. 20-0631

_____

FILED
**November 9, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE D.P. AND G.P.

_____

AND

_____

No. 20-0632

_____

IN RE A.O., D.P., AND G.P.

_____

Appeals from the Circuit Court of Mercer County
The Honorable Mark E. Wills, Judge
Case Nos. 17-JA-124-MW, 17-JA-125-MW, 18-JA-186-MW

AFFIRMED

_____

Submitted: September 14, 2021
Filed: November 9, 2021

Ward Morgan, Esq.
Law Office of Ward Morgan
Bluefield, West Virginia
Counsel for Petitioner/Respondent T.P.

John G. Byrd, Esq.
Public Defender Corporation
Princeton, West Virginia
Counsel for Petitioner/Respondent K.O.

Patrick Morrisey, Esq.
Attorney General
Mindy M. Parsley, Esq.
Assistant Attorney General
S. L. Evans, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent West Virginia
Department of Health and Human
Resources

Andrea Powell, Esq.
Law Office of Andrea Powell

Princeton, West Virginia
Guardian ad Litem for the Minor Children

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected.  These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."  Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.      "As a general rule, the least restrictive alternative regarding parental rights to custody of a child under [West Virginia Code § 49-4-604 (2020)] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical

development [delayed] by numerous placements." Syl. Pt. 1, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

3.      "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604 (2020)] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(c)] that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

WOOTON, Justice:

In May 2017, the West Virginia Department of Health and Human Resources ("DHHR") removed the minor children A.O. and D.P.[1] from the home they shared with their parents. The DHHR then filed an abuse and neglect petition against Petitioner Father T.P.[2] and Petitioner Mother K.O.[3] ("Petitioner Father", "Petitioner Mother", collectively "Petitioners") alleging neglect due to inadequate supervision as to A.O. and D.P.; an amended petition was filed in September 2018 to include G.P., who was born during the pendency of these proceedings. Petitioners stipulated to having neglected the children, and the circuit court granted them post-adjudicatory improvement periods. These improvement periods continued well past the statutory time limits despite Petitioners' minimal improvement. At disposition, the circuit court found that, while Petitioners had started to improve, their progress was insufficient to regain custody of their children. The circuit court then terminated Petitioners' parental rights.

On appeal, Petitioners argue the circuit court erred in terminating their parental rights rather than imposing a less restrictive alternative, insofar as the circuit court should have permitted them to retain custody of one or two of the children. The DHHR

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015).

[2] Petitioner Father is the biological father of D.P. and G.P. A.O.'s biological father is N.B., who is not a party to this appeal, but whose rights have also been terminated.

[3] Petitioner Mother is the biological mother of all three children.

1

and the guardian ad litem (sometimes "guardian") respond that Petitioners demonstrated an overall lack of improvement in their lengthy improvement periods and the circuit court correctly determined there was no reasonable likelihood the conditions of abuse or neglect could be substantially corrected in the near future, necessitating the termination of their parental rights. Because we find that the circuit court did not err in so finding, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 15, 2017, Mercer County law enforcement was informed that an unsupervised child had been found wandering beside a congested stretch of U.S. Route 52. The child, A.O., was then three years old and suffered from severe autism. A tenant in a nearby apartment complex retrieved A.O., and, before law enforcement could arrive, Petitioner Mother picked the child up from that tenant's apartment. A police officer arrived shortly after and spoke with Petitioner Mother, who explained that she had fallen asleep and awoken to find A.O. missing. She said this was the first time A.O. had gotten out of the house and that Petitioner Father must have left the front door unlocked when he left for work that morning. The officer advised Petitioner Mother to ensure the door was locked moving forward and suggested that she rotate the orientation of the chain lock to prevent the door from opening wide enough for a child to pass through.[4]

---

[4] The officer also noted that the home was unsanitary at the time of his visit, and that A.O. appeared not to have been bathed in several days. Later the same day, a Child Protective Services ("CPS") worker observed the same conditions, and also noted there

Two days later, A.O., once again, was found wandering by the road unsupervised. Law enforcement retrieved the child, contacted the DHHR, and returned to Petitioners' apartment. Upon their arrival, the officers found Petitioners asleep, entirely unaware that A.O. had again left the home. At this time, the DHHR determined that Petitioners were unable to adequately supervise the children and implemented an emergency protection plan, thereby removing A.O. and D.P. from the home and temporarily placing them with a relative. The DHHR filed an abuse and neglect petition in the Circuit Court of Mercer County two days after the removal alleging neglect due to lack of supervision.[5]

At the adjudicatory hearing, Petitioners stipulated to the neglect allegation. The circuit court accepted Petitioners' stipulations and adjudged the children as neglected. Petitioners then moved for post-adjudicatory improvement periods, and the circuit court granted those motions.

The first review hearing on the improvement periods occurred on November 20, 2017. At this time, the DHHR informed the court that the parents were "actively participating" in parenting and adult life skills services, and that they were "taking in the

___

was little to no food in the home. The CPS worker purchased baby formula for D.P. and took Petitioner Mother to a local mission to get food.

[5] The petition also included an allegation of abandonment against N.B., A.O.'s biological father.

3

information" they were given in those classes. The circuit court continued the improvement periods.

The next review hearing did not occur until nearly seven months later, on June 18, 2018. At this hearing, the DHHR informed the court that Petitioners were no longer complying with services, that they had housing stability issues,[6] and that their attendance at supervised visits with the children was "sporadic at best." Despite this turn of events, the circuit court continued Petitioners' improvement periods, but stated that they would now be on "dispositional improvement periods."[7]

Before the next review hearing could take place, Petitioner Mother gave birth to G.P. The DHHR removed G.P. and placed him in foster care.[8] The DHHR then

---

[6] The transcript for this review hearing reveals that Petitioners were no longer residing in an apartment, but in a camper with no electricity, and possibly without running water.

[7] We note that West Virginia Code § 49-4-610 (2015) sets out three types of improvement periods: (1) pre-adjudicatory; (2) post-adjudicatory; and (3) post-dispositional. By that statute's clear language, a post-dispositional improvement period is only available pursuant to disposition under West Virginia Code § 49-4-604 (2020). *Id.* § 49-4-610(3). No such disposition had occurred at this time in this matter. We, therefore, assume that the circuit court simply meant to extend Petitioners' post-adjudicatory improvement periods. However, such extension is similarly unauthorized as Petitioners' post-adjudicatory improvement periods had already lasted for ten months—from August 2017 to June 2018—which exceeds the nine-month time limit on post-adjudicatory improvement periods. *See id.* § 49-4-610(2) (providing for a six-month post-adjudicatory improvement period) and § 49-4-610(6) (allowing for a three-month extension to a post-adjudicatory improvement period).

[8] It is not entirely clear why G.P. was not placed in the same relative placement with A.O. and D.P., but we can glean from the record and the parties' briefs that there were

4

amended the abuse and neglect petition to add G.P. to these proceedings, again alleging neglect resulting from inadequate supervision. Petitioners waived their preliminary hearing and stipulated to this allegation at the joint adjudicatory/review hearing on September 28, 2018. The court accepted Petitioners' stipulations. At the same hearing, the circuit court was informed that Petitioners still were not complying with the terms of their improvement periods granted pursuant to the original adjudication involving A.O. and D.P. Despite this, the circuit court again continued those improvement periods and granted a post-adjudicatory improvement period pursuant to the new adjudication regarding G.P.

The next review hearing took place on December 10, 2018. The circuit court was informed at this hearing that Petitioners were "fully compliant" with services. They had met with service providers, obtained suitable housing in an apartment complex, and attended regular visits with the children. In fact, they were doing so well the DHHR increased the number of visits at this time. Further, Petitioner Father had obtained new employment. Relying upon this information, the circuit court extended Petitioners' improvement periods once again. Another review hearing in January 2019 was similarly positive.

At a review hearing in April 2019, the circuit court heard testimony from a CPS worker that Petitioners were not implementing the parenting skills they learned

concerns the maternal grandmother, who had physical custody of A.O. and D.P. at the time, would not be able to care for a third child.

5

through the services provided. The court then determined that the parents had "started to improve" but that their improvement had not been sufficient to regain custody of the children; the court set the matter for disposition on August 19, 2019.[9]

Disposition did not occur in August 2019, and the next hearing was a "review of placement options" conducted on November 25, 2019. At this hearing, the court was again informed that Petitioners were making only minimal progress in their improvement periods, and the DHHR noted its concerns about Petitioner Mother's ability to care for all three children, stating that it did not "feel that the parents are capable of maintaining the consistency that they need to have the children returned to their care." Similarly, the guardian informed the court that visits with the children had been "really chaotic." After considering these statements, the circuit court scheduled disposition for January 17, 2020.

---

[9] At this point, we must pause to recognize a procedural irregularity in this matter. The August 2019 hearing did not proceed as a dispositional hearing but was essentially another review hearing. While the parties did not explain this in their briefs, upon reviewing the hearing transcript, it appears that the parties and the circuit court were uncomfortable proceeding to disposition because they were exploring the viability of placing one of the children, specifically G.P., with Petitioners. The parties vaguely allude to this in their briefs, and it appears that Petitioners predicate their arguments on this development, arguing that they should have been permitted to retain the rights to at least one of the children. At oral argument, counsel for Petitioner Mother and the DHHR explained that there is allegedly an "informal policy" in Mercer County which may permit parents to retain the rights to one or more of their children, even when there has been a determination that they cannot care for the others. While this issue is not before us on appeal, this scenario elicits grave concern as the parties fail to identify any authority in the West Virginia Code or the precedent of this Court which would permit such a policy.

The dispositional hearing did not take place until nearly seven months later, on June 29, 2020. At that hearing, the circuit court heard testimony from the DHHR worker assigned to this case that "[t]he parents are unable to supervise and provide for all three children together." While much of that worker's concern was focused on Petitioner Mother's inability to parent successfully without intervention, she also opined that Petitioner Father was only "a little better." She stated that both parents still needed regular prompting to care for the children.

Michael Brown, a service provider, testified that he observed and supervised several of Petitioners' visits with the children. He noted that, while Petitioners worked well together, Petitioner Mother was not able to care for the children on her own, which was of concern because she would be expected to be the primary caregiver due to Petitioner Father's employment. Moreover, Mr. Brown testified that he was never able to observe Petitioner Father parenting alone, but that he "would have serious concerns" about Petitioner Father's ability to do so. A different visitation supervisor confirmed this testimony, noting that the visits were generally chaotic. She testified that the visits lacked structure when Petitioner Father was absent, and that while the parents performed better "as a unit," there were still deficiencies in their parenting abilities.

In addition to the troubling patterns surrounding the visits, the court heard testimony that Petitioners had not participated in services in some time. While Petitioner Father testified that he believed the DHHR did not provide "enough" services, the DHHR

7

elicited testimony from him that he had not been in contact with, nor had he even attempted to contact, the DHHR since February 2020, nearly five months before this hearing. Petitioner Father attempted to explain his lack of contact by stating that he was prioritizing a new business he had started and was "trying to build it up."

The circuit court weighed the testimony presented and found that, while Petitioners loved the children, it "d[id] not believe [they] [were] capable of taking care of the children[.]" The circuit court then found that there was no reasonable likelihood the conditions of abuse or neglect could be substantially corrected in the near future, and terminated Petitioner Mother's parental rights to all three children and Petitioner Father's parental rights to D.P. and G.P.[10] Petitioners now appeal that order.

## II. STANDARD OF REVIEW

This Court has long applied the following standard of review to appeals in the context of abuse and neglect matters:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm

---

[10] The circuit court also terminated N.B.'s parental rights to A.O. N.B.'s case is not before us in the instant appeal.

conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

With this standard in mind, we proceed to address the parties' arguments.

### III. ANALYSIS

Though Petitioners appeal the termination of their parental rights separately, they advance nearly identical arguments. They contend the circuit court erred in terminating their parental rights rather than imposing a less restrictive alternative disposition. Put more simply, Petitioners contend that the evidence presented below showed they were capable of caring for one or two of the three children; therefore, the circuit court should have allowed them to retain their rights to at least one child. The DHHR and the guardian respond that the circuit court was not required to exercise a less restrictive alternative disposition upon finding there was no reasonable likelihood the conditions of abuse or neglect could be substantially corrected in the near future. We agree.

Before proceeding to address the parties' arguments regarding termination of Petitioners' parental rights, we feel compelled to once again remind the courts to adhere to the statutory timeframes for improvement periods set forth in the West Virginia Code. The post-adjudicatory improvement periods in this case started in August 2017 with regard to

9

A.O. and D.P., and in September 2018 with regard to G.P. All of these post-adjudicatory improvement periods continued until disposition in June 2020, for periods of approximately thirty-four and twenty-one months, respectively. This is well in excess of the statutory time limits placed on post-adjudicatory improvement periods and improvement periods generally.

West Virginia Code § 49-4-610(2) permits an initial six-month post-adjudicatory improvement period. West Virginia Code § 49-4-610(6) permits a three-month extension to such an improvement period upon the circuit court making specific findings. Therefore, at the latest, the post-adjudicatory improvement periods stemming from the original petition covering A.O. and D.P., having started in August 2017, should have ended in May 2018, and the court should have moved to disposition. At that point, the court could have granted a post-dispositional improvement period pursuant to West Virginia Code § 49-4-610(3). It did not do so; instead it allowed those post-adjudicatory improvement periods to continue for another two years. Further, we are compelled to note that the orders granting these repeated extensions failed to make the requisite findings under § 49-4-610(6) that: (1) Petitioners substantially complied with their improvement periods; (2) the extension would not substantially impair the ability of the DHHR to permanently place the children; and (3) the extension was in the best interests of the children.

Similarly, Petitioners' post-adjudicatory improvement periods resulting from their adjudication on the amended petition started in September 2018. The same statutory limits apply requiring these post-adjudicatory improvement periods to have ended no later than June 2019. As above, the circuit court could have then proceeded to disposition and granted a post-dispositional improvement period under West Virginia Code § 49-4-610(3) if such an improvement period was warranted. Once again, the court did not do that, instead allowing this improvement period to continue for an additional year. Also as above, the orders granting these extensions did not make the requisite findings under West Virginia Code § 49-4-610(6).

Not only did these improvement periods far exceed the statutory limits placed on post-adjudicatory improvement periods *specifically*, they are also in excess of the limit placed on all combinations of improvement periods *generally*. West Virginia Code § 49-4-610(9) explicitly states:

> Notwithstanding any other provision of this section, no combination of any improvement periods or extensions thereto may cause a child to be in foster care more than fifteen months of the most recent twenty-two months, unless the court finds compelling circumstances by clear and convincing evidence that it is in the child's best interests to extend the time limits contained in this paragraph.

By granting these repeated extensions to Petitioners' improvement periods, the circuit court allowed them to exceed this time limitation. Yet again, there are no orders making the requisite findings under § 49-4-610(9) to justify this failure to adhere to the statutory limits.

11

On more than one occasion, this Court has been compelled to remind the circuit courts that the statutory time limits set forth in the Code are mandatory. In *In re J.G.*, 240 W. Va. 194, 809 S.E.2d 453 (2018), we made clear that

> [t]he procedural and substantive requirements of West Virginia Code § 49-4-601 *et seq*., the Rules of Procedure for Child Abuse and Neglect [Proceedings], and our extensive body of caselaw are not mere guidelines. The requirements contained therein are not simply window dressing for orders which substantively fail to reach the issues and detail the findings and conclusions necessary to substantiate a court's actions. The time limitations and standards contained therein are mandatory and may not be casually disregarded or enlarged without detailed findings demonstrating exercise of clear-cut statutory authority.

240 W. Va. at 204, 809 S.E.2d at 463.

In this vein, we have noted that "[c]hild abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *In Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991). To that effect, we have held that "matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and . . . such proceedings must be resolved as expeditiously as possible." *Id.* at 616, 408 S.E.2d at 368, syl. pt. 5, in part. We are sympathetic to the plight facing our circuit courts and the ever-increasing number of abuse and neglect petitions they must handle each year. We are also cognizant that "many delays are occasioned by the fact that . . . aggravated parenting problems are not remedied overnight" and of the desire to give parents every opportunity

12

to demonstrate sufficient improvement to regain custody of their children. *Id*. at 623, 408 S.E.2d at 375. However, as we have said before, those sympathies do not permit us to disregard the express requirements set forth by the Legislature in the West Virginia Code.

In the case at bar, the circuit court blatantly disregarded those requirements by permitting these post-adjudicatory improvement periods to extend far beyond their statutory time limits. While this is not an issue that bears upon the resolution of the case before us today, we are compelled to highlight this disregard to once again reiterate to the circuit courts of this State that these time limits are mandatory and may only be enlarged pursuant to the enumerated procedures for doing so in our statutes. Those procedures were not followed in this case, and the delay resulting therefrom worked only to the detriment of these children insofar as it delayed achieving permanency for them.

Having addressed this issue, we now return to the parties' arguments regarding the termination of Petitioners' parental rights. Petitioners contend that the circuit court erred in failing to employ a less-restrictive dispositional alternative before proceeding to terminate their rights. In this regard, we have held:

> As a general rule, the least restrictive alternative regarding parental rights to custody of a child under [West Virginia Code § 49-4-604 (2020)] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and

13

are likely to have their emotional and physical development [delayed] by numerous placements.

Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604 (2020)] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(c)] that conditions of neglect or abuse can be substantially corrected.

Syl. Pts. 1 and 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

Applying these holdings to the instant case, we have little trouble concluding that the circuit court did not err in declining to impose a less restrictive alternative disposition before terminating Petitioners' parental rights. Both at the dispositional hearing and in the final order terminating Petitioners' parental rights, the circuit court found "there is no reasonable likelihood that the conditions of abuse and/or neglect can be substantially corrected in the near future[.]" Having reviewed the entire record, we are convinced that the court's finding was justified.

Throughout the underlying proceedings, Petitioners' improvement periods were plagued by fluctuations from periods of full compliance to periods of substantial noncompliance. In the beginning, Petitioners actively engaged in services and visits with the children. But their engagement ended relatively quickly, and the DHHR informed the court that they were no longer participating in services, and that they were not in contact with their service provider. After the birth of G.P., things again improved, as Petitioners began fully complying with services again and attended many visits with the children. In

14

fact, they were doing so well the DHHR increased those visits. However, just as before, Petitioners stopped complying. They virtually dropped off the radar, cutting communications with their service provider and failing to maintain any contact with the DHHR for the five months preceding the dispositional hearing.[11] When asked about this failure to engage in services, Petitioner Father attempted to deflect by stating that he did not believe the DHHR had provided "enough" services to Petitioners. As to the failure to remain in contact, Petitioners explained that they were preoccupied starting a new business, which apparently took priority over their efforts to regain custody of their children.[12]

Moreover, even when Petitioners were improving, they were doing so only minimally. Throughout the proceedings, the DHHR and the guardian repeatedly raised concerns that Petitioners were not implementing the skills they learned in the services they attended, and the basis for these concerns was clearly illustrated in Petitioners' visits with

---

[11] We acknowledge that beginning in March 2020, this Court's pandemic protocols resulting from the COVID-19 pandemic were in effect, which severely limited the provision of services. However, that does not explain Petitioners' sudden cessation of contact in February 2020.

[12] We do not suggest that Petitioners' attempts to provide financially for the children should be disregarded. By all accounts, Petitioner Father held steady employment which required long working hours throughout these proceedings, and he consistently expressed his desire to provide for the children. We commend him for doing so, and we do not wish to discount his efforts to become self-employed so that he could assist more in the day-to-day care of the children. However, we are concerned, just as the circuit court apparently was, that both Petitioners failed to properly prioritize matters that were more directly tailored to rectifying the conditions of abuse and neglect, specifically participation in services that would enable them to properly supervise the children.

15

the children. From relatively early on in this matter, the guardian described the visits as "really chaotic." Visitation supervisors testified at the disposition hearing to that effect, noting that Petitioner Mother simply was not able to safely care for all three children. They also testified that Petitioner Father only performed "a little better," and, when asked whether he could parent the children alone, Mr. Brown, a service provider, testified that he "would have serious concerns" about that prospect. We also cannot ignore that the service providers and visitation supervisors were never able to observe Petitioner Father parenting alone, which may have provided valuable information in determining whether these children could be safely returned to his care. In any case, one theme is consistent throughout the testimony of the individuals below: they were not confident Petitioners could safely supervise these children if returned to their care. That lack of confidence struck at the heart of this matter as the allegation in the petition was neglect resulting from inadequate supervision. Accordingly, Petitioners had clearly not rectified the concerns giving rise to the filing of the petition by the time of the dispositional hearing.

On the whole record, we are satisfied that the circuit court correctly found that there was no reasonable likelihood Petitioners could substantially correct, in the near future, the conditions of neglect that led to the filing of this petition. In fact, Petitioners had not done so, despite having had nearly three years to show some improvement in this regard. Because the circuit court's finding was correct, per our explicit holdings in *In re R.J.M.*, it was not required to employ a less restrictive alternative disposition before

16

proceeding to termination.  164 W. Va. at 496, 266 S.E.2d at 114, syl. pts. 1 and 2. Therefore, we affirm the termination of Petitioners' parental rights.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the Circuit Court of Mercer County's July 21, 2020, Order terminating Petitioner Mother's parental rights to the minor children A.O., D.P., and G.P., and Petitioner Father's parental rights to the minor children D.P. and G.P.

Affirmed.